■ LILI STAWSKI, Appellant, v AXEL STAWSKI, Respondent. [843 NYS2d 544]—

Order, Supreme Court, New York County (Marian Lewis, Special Ref.), entered March 29, 2006, which denied plaintiff's application to set aside a prenuptial agreement, and determined that agreement to be valid and enforceable, affirmed, without costs.

Plaintiff, an American citizen who married defendant, a German citizen, in 1975, seeks to set aside a prenuptial agreement executed by the parties in Germany shortly before they wed. The agreement, in accordance with German law, provides for a "separation of property" regime, i.e., it requires that each spouse retain ownership of all property held at the time of the marriage or acquired thereafter.

The evidence, as credited by the Special Referee, established that the agreement was signed on December 19, 1974 in the presence of an official representative of a German "notar," a neutral official who explained the agreement, which was written in German, and its consequences prior to its execution. After hearing the testimony and observing the witnesses, the Special Referee found that the notar's representative was a "very credible witness." Accordingly, she credited his testimony that he spoke English fluently in 1974, was able to converse with plaintiff in both German and English and explained the agreement to her in English. Additionally, he testified that when he met with the parties he determined that they understood the language as well as the contents and consequences of the agreement and he would not have proceeded with the execution if it appeared otherwise.

Plaintiff, who was 22 years old and a graduate student at

New York University at the time she executed the agreement, asserts that she did not understand the agreement or its consequences, but admits that she signed it voluntarily. She did not show any signs of duress during the execution of the agreement and did not ask the notar's representative any questions about the agreement. Furthermore, despite her asserted lack of understanding, she acted in accordance with the terms of the agreement throughout the marriage, maintaining separate bank accounts in her own name in which she deposited income from properties she inherited from her family, which properties were themselves also retained by plaintiff solely in her name.

"[T]he decision of the fact-finding court should not be disturbed upon appeal unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence, especially when the findings of fact rest in large measure on considerations relating to the credibility of witnesses" (*Thoreson v Penthouse Intl.*, 80 NY2d 490, 495 [1992] [internal quotation marks omitted]). It cannot be said that the Special Referee's conclusions were not based on a fair interpretation of the evidence, and there is thus no basis for reversal. The agreement is fair, neutral and valid on its face and the issue determined by the Special Referee was therefore solely one of credibility.

Furthermore, the public policy of this State favors " 'individuals ordering and deciding their own interests through contractual arrangements' " (*Van Kipnis v Van Kipnis*, 43 AD3d 71, 76-77 [2007], quoting *Bloomfield v Bloomfield*, 97 NY2d 188, 193 [2001]), and thus, duly executed prenuptial agreements, including agreements executed in a foreign country, are accorded the same presumption of legality as any other contract (*see Greschler v Greschler*, 51 NY2d 368 [1980]). A party attacking the validity of the agreement has the burden of coming forward with evidence showing fraud, which will not be presumed, and must have as its basis evidence of overreaching—the concealment of facts, misrepresentation or some other form of deception (*see Matter of Sunshine*, 51 AD2d 326 [1976], *affd* 40 NY2d 875 [1976]). Plaintiff completely failed to meet that burden.

The numerous circumstances cited by plaintiff as irregularities, including her alleged lack of fluency in the German language, defendant's superior education, the fact that she was unrepresented by counsel and that the agreement was written by a law firm that had previously done business with defendant's family, do not establish overreaching on defendant's part, especially in view of the uncontradicted testimony that the agreement was explained to plaintiff in English. In reaching the op-

posite conclusion, the dissent adopts a highly skewed version of the facts in the course of portraying plaintiff as a naive individual who was the victim of elaborate "machinations" that were calculated to induce her to sign an agreement she did not understand. However, at the time the agreement was executed, plaintiff had received her B.A. from a prestigious university, New York University (where she took such courses as "International Law," "Ideas & Action I: Law in Society," "International Politics" and "U.S. Foreign Policy") and was pursuing a Master's degree in political science from that same university.

The dissent not only understates plaintiff's sophistication, knowledge and intellect, it attempts to transform a simple document—drafted from Germany's equivalent of a Blumberg form—that employs a common property concept into a highly complex legal document. Contrary to the dissent's assertion, the concept of the separate property regime is not a difficult one to understand. Because complexities can arise, it hardly follows that the basic concept is abstruse. In short, the evidence amply supports the Special Referee's conclusion that plaintiff is properly charged with knowledge of the agreement's contents (*see Stein-Sapir v Stein-Sapir*, 52 AD2d 115 [1976]).

In *Stein-Sapir*, the defendant husband sought to set aside a prenuptial agreement that was written in Spanish, a language he did not speak, and was executed in Mexico immediately prior to the marriage ceremony. Although neither party spoke Spanish, the law of the State of Guerrero, where the parties were married, required that they present an agreement with respect to property they presently owned as well as property that might be acquired during the marriage. Mexican law further required that a civil official "carefully explain to the parties all that they may need to know to the effect that the agreement may be duly drawn up" (*id.* at 117). The plaintiff wife testified that the agreement was fully explained in English; the defendant husband, an attorney and Fulbright scholar, denied that any such explanation had been given but admitted that the signatures on the document looked like his signature and that of the plaintiff.

This Court upheld the agreement in *Stein-Sapir*, finding that if defendant "did not read or understand the agreement, or have any explanation of the same, his conduct evidenced a degree of carelessness or negligence not to be expected of a sophisticated and mentally brilliant person" (*id.*). One need not be an attorney or a Fulbright scholar to know the folly of signing a legal document without an understanding of its import. As the dissent acknowledges, plaintiff was "a bright, intelligent

young woman" at the time she signed the agreement. Accordingly, her claimed ignorance of the meaning of the document she concededly signed without protest is incredible.*

The dissent criticizes the notar's representative, asserting that he was an inexperienced apprentice who did not have any customary practices at the time of the execution of the agreement. This assertion ignores the testimony that the notar's representative began working with and observing his mentor, an attorney and notar, in the autumn of 1972, assisted with or observed more than 300 notarial transactions and handled six or seven transactions on his own during the two years prior to the execution of the agreement. Based on this testimony, the Special Referee properly relied on the notar's representative's description of his customary practices (*see Halloran v Virginia Chems.*, 41 NY2d 386 [1977]).

As the Special Referee noted, plaintiff's only potentially viable claim is one for fraud based on her assertion that she was told that the purpose of the agreement was to protect defendant in the event of bankruptcy. However, plaintiff admitted that she could not identify the person who allegedly provided this explanation and the Special Referee did not credit plaintiff's testimony in this regard. Furthermore, the Special Referee made a specific finding on this subject, crediting defendant's testimony that he did not provide that explanation to plaintiff. Not surprisingly, plaintiff has abandoned this argument on appeal. Accordingly, the dissent's reliance on this alleged statement in support of the position that plaintiff was the victim of fraud or overreaching is misplaced.

Although the dissent essentially accepts plaintiff's version of the relevant facts, the Special Referee clearly did not credit plaintiff's version of the facts. Consistent with its approach, the dissent writes that plaintiff "in fact was entirely unaware of the purpose of the visit prior to arriving at the lawyers' office" in Frankfurt, Germany. As the Special Referee stated, however, "[t]he most credible scenario is that defendant did discuss the execution of the separation of property document with plaintiff's father, as she requested, and it was plaintiff's father . . . who did not object, and advised his daughter that at some point, she would be signing a document that 'had something to do with bankruptcy.' " As the Special Referee immediately went on to

---

* A related claim plaintiff made at the hearing casts additional doubt on her credibility. As the Special Referee noted, even though plaintiff was represented at the hearing by prominent matrimonial counsel, she nevertheless claimed at the hearing that she still did not understand the legal import of the agreement.

observe, moreover, "[b]ut even if this is not what occurred, if plaintiff did not understand the document, she should not have signed it."

We have considered plaintiff's remaining contentions and find them unavailing. Concur—Tom, J.P., Buckley and McGuire, JJ.

Saxe, J., dissents in a memorandum as follows: In December of 1974, an affianced young American woman in the bloom of love, traveling with her German fiancé to his parents' home in Frankfurt, en route to a skiing vacation in Switzerland, experienced a sudden and unexpected detour to a lawyer's office in Frankfurt, where she was presented with a prenuptial agreement. Her execution of that document, and its enforceability, form the basis for this appeal.

The Special Referee, who was requested to hear and determine the controversy, held that the agreement is enforceable, and the majority agrees. However, in my view, the confluence of various questionable practices and procedural irregularities surrounding the execution of the agreement makes this the exceptional case in which an antenuptial agreement should be set aside. The evidence establishes that plaintiff's signature was obtained through a combination of deception and overreaching, causing an unknowing waiver of unexplained rights. Accordingly, I dissent.

Plaintiff wife and defendant husband are children of Holocaust survivors; the parents met in a displaced persons camp outside Frankfurt, Germany after World War II, and ultimately settled there. Plaintiff's family moved to the United States 3½ years later, and settled in New York City, where plaintiff was born. Defendant's family remained in Germany. He was educated in England beginning at age 10 and received a law degree from Birmingham University in England. After briefly meeting at a dance in Frankfurt in the 1960s when she was 12 and he was 14, plaintiff and defendant met again in 1971, when she was 19 and an undergraduate at New York University and he was 21 and studying for a Master's degree in International Law at the same university. They became engaged in the summer of 1974 and married in 1975.

In December 1974, the affianced couple traveled together from New York to Frankfurt, where defendant's parents lived, in anticipation of a winter ski vacation. Upon their arrival in Germany, defendant told plaintiff that before they left for Switzerland, it was necessary for both of them to attend a meeting with a lawyer. The parties dispute the exact explanation provided to plaintiff as to the need for this meeting; she testified that the reason defendant gave her was the necessity of

"signing a piece of paper for bankruptcy." Plaintiff also testified that she and defendant had no prior discussions regarding the signing of any agreement having to do with their marital or property rights. For his part, defendant testified that he brought up the subject of a premarital agreement with plaintiff in the autumn of 1974 and that she asked him to discuss the matter further with her father, which he testified he did, although both plaintiff and her father disputed this assertion.

The couple went to the office of a law firm in Frankfurt. It is undisputed that the law firm represented defendant's family in various legal matters. The parties appeared before Dr. Nikolas Hensel, who, aside from being an attorney, was apprentice to a notar. In Germany, a notar is a public official before whom certain types of transactions, including marital agreements, must be executed in order for them to be valid. A notar serves as an independent consultant for the parties to the transaction, and is responsible for exploring and ensuring the parties' understanding of the transaction and its legal consequences. At the time, Dr. Hensel was not yet officially a notar, but was apprenticed to an older notar, Dr. Rudolph Boergner, for whom he was properly substituting on the date of execution of the agreement.

After exchanging pleasantries with the parties, Dr. Hensel showed them the agreement, which was written in German. Apparently, neither of the parties had seen either the final document or even a draft of the document before the visit. Dr. Hensel initially read the agreement to the young couple in German. The agreement was not a long one. It stated that the signatories (plaintiff and defendant) planned to get married in 1975 and, as translated into English, that: "We hereby agree that for the time of our marriage we exclude the legal regime of joint ownership of any increase in property. Instead we will adopt the regime of legal separation of property. The notar's representative informed us on the legal significance of such a decision." Thirty years later, in a court in New York, it is this language that is relied upon to bar plaintiff from sharing at all in increases in the value of defendant's separately-owned property during the course of the marriage.

New York has a "strong public policy favoring individuals ordering and deciding their own interests through contractual arrangements" (*Bloomfield v Bloomfield*, 97 NY2d 188, 193 [2001] [internal quotation marks omitted]). "Duly executed prenuptial agreements are accorded the same presumption of legality as any other contract" (*id.*), and thus "[are] presumed to be valid in the absence of fraud" (*Matter of Sunshine*, 51 AD2d

326, 327 [1976], *affd* 40 NY2d 875 [1976]). The party challenging the agreement "bears the very high burden of showing that it is manifestly unfair and that this unfairness was the result of overreaching" (*Bronfman v Bronfman*, 229 AD2d 314, 315 [1996]).

Nevertheless, the presumption of validity and burden of proof articulated in these cases does not "entirely insulate[ ] prenuptial agreements from typical contract avoidances" (*Matter of Greiff*, 92 NY2d 341, 345 [1998]). In *Greiff*, the couple got married when the wife was 65 and the husband was 77. Prior to the marriage, they executed reciprocal prenuptial agreements containing waivers of the statutory right of election; three months later, the husband died, and the wife sought to claim her elective share, which the husband's children disputed. The Surrogate found that "the husband 'was in a position of great influence and advantage' in his relationship with his wife-to-be," and that he had " 'exercised bad faith, unfair and inequitable dealings, undue influence and overreaching when he induced the [wife] to sign the proffered antenuptial agreements,' particularly noting that the husband had 'selected and paid for' the wife's attorney" (*id.* at 344). Despite these findings, the Second Department initially reversed, holding that the wife had not satisfied her burden of proof by showing that her execution of the document was procured by fraud or overreaching (242 AD2d 723 [1997]). The Court of Appeals remitted the matter to the Appellate Division, explaining that the burden of proof may in appropriate circumstances be placed on the party who obtained the other spouse's agreement to the waiver. The *Greiff* court observed: "This Court has held, in analogous contractual contexts, that where parties to an agreement find or place themselves in a relationship of trust and confidence at the time of execution, a special burden may be shifted to the party in whom the trust is reposed (or to the proponent of the party's interest, as in this case) to disprove fraud or overreaching (*see, e.g., Matter of Gordon v Bialystoker Ctr. & Bikur Cholim*, [45 NY2d 692,] *supra*, at 698-699; *Christian v Christian*, 42 NY2d 63, 72; *Sharp v Kosmalski*, 40 NY2d 119, 121-122; *see also*, I Farnsworth, Contracts § 4.11 at 452 [2d ed])." (92 NY2d at 345.) It therefore instructed the Appellate Division that "[a] specific frame of reference for that court should be whether, based on all of the relevant evidence and standards, the nature of the relationship between the couple at the time they executed their prenuptial agreements rose to the level to shift the burden to the proponents of the agreements to prove freedom from fraud, deception or undue influence" (*id.* at 347).

When the Second Department, on remand, reassessed the ev-

idence in *Greiff* in accord with these directions, it still reversed the Surrogate's determination setting aside the agreement as a product of overreaching, rejecting the wife's claim that she "was not advised of the effect of the prenuptial agreement, failed to comprehend it, or entered into it unwillingly" (262 AD2d 320, 321 [1999], *lv denied* 93 NY2d 817 [1999]).

The facts of the case before us stand in sharp contrast. Numerous factors combine here to establish that defendant and his family intentionally orchestrated the presentation of the prenuptial agreement so that plaintiff was neither fully advised of its effect nor fully able to comprehend the waiver it involved. On the record before us, not only does the evidence warrant a shifting of the burden to defendant to establish a lack of fraud, deception, or overreaching, but upon an independent factual weighing of all the evidence, I would find that defendant's family, with the help of its legal retainers, engaged in machinations calculated to exact acquiescence to a premarital agreement from a trusting young, inexperienced woman. As a result, plaintiff relinquished rights that were not fully or even adequately explained.

A basic tenet underlying the general rules favoring premarital agreements is that, like other agreements, such contracts, being "deliberately prepared and executed," are presumed to reflect the intention of the parties (*see Haynes v Haynes*, 200 AD2d 457, 457 [1994], *affd* 83 NY2d 954 [1994]). However, that presumption, too, is called into question by the entirety of the circumstances here. Indeed, aspects of the document itself lend further support to the conclusion that it bore no relation to the intention of the signatories, but was instead prepared solely by others, for the benefit of others, and was presented to plaintiff in a manner and context that ensured she would sign it without understanding the waiver contained within it.

To begin: the agreement was prepared by the law firm that represented defendant's father. It was never seen by either party in final or draft form before the date it was executed. Indeed, the fact that it listed the address of defendant's parents as the parties' home address further establishes that the parties had no part in its drafting.

Despite the differing accounts of exactly what explanation plaintiff was given for the need to visit the law firm's office in Frankfurt, it is apparent that she had no part in discussions as to the need for, or the proposed provisions to be contained in, a prenuptial agreement, and in fact was entirely unaware of the purpose of the visit prior to arriving at the lawyers' office. Her testimony that she was given the explanation that day as to the

need for the visit as something to do with bankruptcy was even supported by the testimony of the notar's representative that agreements such as the one in question are needed for family-owned businesses to forestall bankruptcy when a part-owner gets a divorce.

Next, importantly, the document plaintiff was asked to sign was written in a foreign language. The evidence fails to support the Special Referee's conclusion that at the time the agreement was executed in 1974, plaintiff's German, although not proficient, was functional. The Special Referee relied on the fact that German was one of the languages spoken in plaintiff's home, but the testimony to that effect was merely that while growing up in her English-speaking household, she heard "a lot of Yiddish, Polish, Hebrew, German and some French" since her mother was "very versed in languages." From that statement it cannot be inferred that those languages were understood by plaintiff. Indeed, plaintiff also testified that prior to her meeting defendant, there were no occasions when she spoke German. Further, plaintiff also established that in May and June of 1974, she took an introductory course in basic German, and that when she was required to take a language for her Master's program in 1975—six months after the parties' marriage—a proficiency test in German placed her in an "intermediate" (i.e. 2d year) German class.

So, at the time plaintiff signed the prenuptial agreement, while she may have had an understanding of basic German, and an ability to communicate using what she described as "pidgin" German, that is a far cry from being able to understand a German legal document, when it is read aloud in German. To the extent that defendant, his father, his sister, and his business partner testified that plaintiff was fluent in German at the time, the direct financial interest they each had in the outcome of the hearing calls that assertion into question; notably, that testimony was not relied upon by the Special Referee.

In view of plaintiff's limited understanding of German, the extent to which she understood the essential content of the document becomes relevant. Interestingly, Dr. Hensel, the notar's representative who presented the document to the young couple and obtained their signatures, testified that he read the agreement aloud in German, and did not directly translate it into English, but rather, described it in English. While there appears to be some disagreement on this point, in that plaintiff testified that Dr. Hensel translated the document into English for her, and defendant testified that Dr. Hensel did not translate the document for her, their testimony is actually reconcilable:

plaintiff might have thought Dr. Hensel's summary or description was tantamount to a translation, while defendant, who had heard and fully understood the German, would have known that it was not.

Not only was the document in a language foreign to plaintiff, but it employed the foreign legal terminology of "property regimes" which, even as explained in English, would warrant legal advice as to its ramifications before it could be deemed to be understood. Although from Dr. Hensel's testimony it appears that the proponents of these documents view these standard form agreements as simple, short and straightforward, the legal concepts they represent, when new and unfamiliar to an individual, are far less so.

Members of the legal profession in this country are, of course, familiar with such concepts as community property, marital property, separate property, and how an increase in the value of separate property may constitute marital property; however, these concepts are not necessarily self-evident to even a bright, college-educated young person. Dr. Hensel's testimony as to the explanation he provided of German law, under which a married couple may select from among several "property regimes" regarding how their property will be treated, failed to rise to the level of establishing that plaintiff could or should have understood the waiver she was being asked to execute.

It is also appropriate to consider the parties' differing levels of knowledge as to the transaction and its terms (*cf. Groper v Groper*, 132 AD2d 492, 497 [1987]). Defendant had a superior knowledge and ability with the German language and a law degree from an English law school, and he was working toward a graduate degree at the New York University School of Law. In addition, since the document was drawn up at his father's behest, defendant, in contrast to plaintiff, undoubtedly had advance knowledge of the nature and contents of the document with which he and his fiancée were presented by Dr. Hensel. In contrast, while plaintiff's completion of her undergraduate education at New York University certainly establishes her general intelligence and education, neither that fact nor the titles of particular courses she took demonstrates a degree of rigor or a particular expertise that might establish her ability to comprehend the nature of the German document presented to her.

The execution process was also flawed in various ways by Dr. Hensel's failure to observe the proper formalities typically employed to protect the rights of signatories. Indeed, the deficiencies in connection with the execution of this agreement are startling.

The notar has an obligation under German law to safeguard the rights of both signatories to an agreement, ensuring that errors are avoided and that the inexperienced and unskilled are not disadvantaged. Indeed, Dr. Hensel portrayed himself as a neutral, impartial figure who was merely presenting the parties with a simple, insignificant document to sign. Yet, *he was employed at the law firm representing defendant's family*; not only can we not assume his neutrality, but in fact, it was in his interest to ensure that the will of his firm's client be carried out. The absence of the required impartiality is, indeed, further demonstrated when we consider that the potential ramifications of the document were substantial, and yet no warning was given to plaintiff as to such possibilities.

The Special Referee saw this situation as amounting to merely a lack of independent counsel on plaintiff's side; however, I view it as more insidious. Where all knowledge and power are located on one side, the problem is far worse than the other side merely lacking independent legal representation. Plaintiff was given no indication that this was an avenue she might pursue, nor any opportunity to consult a trusted advisor such as her father—not even after the document's execution but before the wedding.

One of the flaws of the document execution process was Dr. Hensel's failure to verify with the parties their current addresses, instead leaving intact the incorrect information that the parties resided at defendant's parents' address in Germany. As a result of this superficially minor failure, copies of the executed agreements were sent to the German address, and plaintiff never saw the agreement again until after she commenced the divorce litigation. Had the address been corrected, plaintiff could have had her father, and perhaps New York counsel, review the agreement in advance of the wedding.

Dr. Hensel also failed to ascertain whether plaintiff had discussed the concepts and terms of the property agreement with her own counsel in the United States, or anyone else, prior to its execution. Had the question been asked, and had Dr. Hensel been informed that plaintiff was viewing the agreement and hearing about its terms for the first time, his own standard procedures might have required him to have been more solicitous regarding her position.

Additionally, as discussed previously, Dr. Hensel made no independent determination of the extent of plaintiff's German language skills. Had he comprehended plaintiff's lack of real fluency in German, and taken the time to determine that she was unfamiliar with the rights she was waiving by placing her signature on the document, in the interest of promoting the

proper execution of a fair agreement he might have adjourned its execution, provided plaintiff with an English translation and advised her to seek independent counsel.

The Special Referee was satisfied to accept Dr. Hensel's explanation that he would have stopped the proceeding if he had thought plaintiff did not comprehend his explanation. However, this factual finding was based on the Special Referee's acceptance of his purported customary practice. The trouble with the Referee's conclusion in this regard is that at the time of the agreement's execution, Dr. Hensel was an inexperienced, apprenticed notar, and, frankly, it cannot be said that he had any customary practices at all. To judge Dr. Hensel's customary practices as an experienced notar and to transmute them into his practices as a young, inexperienced notar is an improper use of habit evidence (cf. *Lindeman v Slavin*, 184 AD2d 910 [1992]). Therefore, the Special Referee's conclusion that Dr. Hensel "would have accurately explained the basic legal import of the document" to the parties is aspirational, and not based on any proper view of his habit in similar circumstances. Dr. Hensel simply cannot be assumed to have handled his tasks so early on in his career with the competence and abilities that he acquired over later decades. Indeed, from the deficiencies in the document and the surrounding circumstances, it is apparent that at that time he was less thorough than he would later become.

In concluding that the agreement is enforceable, the Special Referee, citing to *Stein-Sapir v Stein-Sapir* (52 AD2d 115 [1976]), observed that plaintiff was a sophisticated and educated person, capable of understanding that the agreement had legal significance. But, the factual underpinnings of this matter are vastly different than the facts in *Stein-Sapir*. There, the couple, opting to get married in Mexico, was required by that country's law to choose one of the various options available for assigning property rights and to sign a prenuptial agreement incorporating that option; although neither one spoke Spanish, they opted for the community property agreement, and signed it (*id*. at 116). When the question of the applicability of the agreement arose in the context of the couple's divorce, the husband complained that there was no translation of the Spanish-language document and that they had not intended to be bound by it.

This Court in *Stein-Sapir* held the prenuptial agreement valid, observing that the husband was an attorney and Fulbright scholar, and said that "[i]f defendant, as a lawyer, did not read or understand the agreement, or have any explanation of the same, his conduct evidenced a degree of carelessness or

negligence not to be expected of a *sophisticated and mentally brilliant* person" (*id.* at 117 [emphasis supplied]). In the matter now before us, plaintiff, while obviously a bright, intelligent young woman, was lacking the legal background that defendant possessed, as well as his advance knowledge of the contents of the document. She also lacked the language fluency that might have assisted her comprehension or her ability to recognize that the concept under discussion was more complex than the document's brevity implied.

The Special Referee apparently accepted the assertion that the contents of the agreement are simple, and that the waiver it contains was therefore necessarily given with full knowledge of the rights being waived. This view fails to recognize the true complexity of the superficially simple agreement. At the hearing, Dr. Hensel testified that he explained the alternative property regimes; his complete explanation, as he described it, was approximately six sentences. He told the parties that under German law, when a couple does not make any agreement, each spouse's assets remain their own sole property, "but in case of a divorce, you have to balance out any unequal accrued gains made during the marriage. If the man had a higher gain, he has to give something to the woman to equalize it, or if the woman had higher gains, she has to give something to the man." The other two options he described were, "you can exclude this balancing out like it was done here, or you can make an agreement that you have a joint ownership of everything, which is very seldom."

The language used by Dr. Hensel in discussing the "balancing out" of "unequal accrued gains" demonstrates just how unclearly a purportedly knowledgeable individual can be when explaining the law's treatment of increased value of separate property in case of divorce. From what Dr. Hensel described as his explanation, it is inconceivable that a person hearing these concepts for the first time would understand what rights she was waiving. Plaintiff's assertion that she did not comprehend the nature of the document she signed is credible, and, indeed, understandable. Nor may doubt appropriately be cast upon plaintiff's credibility by her testimony at the hearing that, at that time, she still did not understand the terms of the agreement. Given the nature of the litigation, plaintiff undoubtedly understood by the time of the hearing exactly what the legal *effect* of the agreement would be if it were enforced; however, she had good reason to express continued doubt as to the meaning of the words themselves.

Moreover, during the cross-examination of Dr. Hensel regard-

ing the effect of a separate property regime, it became apparent that he was not fully aware of the legal impact the separate property regime would have under certain hypothetical situations. Specifically, he was unsure about whether an increase in the value of separately owned shares of stock during the marriage would be treated as "accrued gains," and about the impact of losses in the value of separate property during the marriage. Moreover, defendant's own expert in German family law indicated that Dr. Hensel was wrong in his understanding of how appreciation in value of separately owned real estate would be treated under the standard regime.

The agreement recites that "the notar's representative informed us on the legal significance of such a decision." Yet, from the testimony, it is difficult to avoid the inference that Dr. Hensel's original cursory explanation must have been inadequate to actually inform plaintiff of the legal significance of the agreement. If the official who had the obligation to ensure that the parties understood the terms of the agreement, particularly the all-important waiver of rights, did not himself understand those rights, we should not accept the bare assertion that those rights were properly explained to plaintiff.

Indeed, the development of the law of marital and separate property in New York State since the enactment in 1980 of the Equitable Distribution Law (L 1980, ch 281, § 9) highlights the complexity of deciding under which circumstances increases in the value of separate assets should be divided between spouses (*see e.g. Hartog v Hartog*, 85 NY2d 36, 46 [1995]; *Price v Price*, 69 NY2d 8 [1986]).

In view of the foregoing, the short description of the separate property regimes given by Dr. Hensel was simply inadequate under the circumstances to inform plaintiff of the rights she was waiving. It cannot have been incumbent upon plaintiff to question Dr. Hensel on the consequences of such a property regime, but based upon my understanding of a notar's responsibilities, it was derelict of Dr. Hensel not to raise some of the complex issues that might later surround such a separate property regime. The failure to adequately explain the ramifications of the regime being selected when plaintiff signed the agreement was critical here, since under German law, in the absence of the agreement, any increase in value during the marriage of each party's property would be joint property, to be divided equally upon marital dissolution.

In conclusion, the manner in which plaintiff's signature was obtained creates a clear inference of overreaching; the burden must certainly be placed on defendant to prove that there was

no overreaching, and defendant failed to meet that burden. The facts are that plaintiff, with no advance notice, was brought to the office of defendant's family's lawyers, and presented with a German document that, while purporting to be simple, dealt with unfamiliar concepts of German marital property "regimes," in German. The purportedly neutral Dr. Hensel, whose obligation was to ensure that everything was handled fairly and properly, failed to check that plaintiff, a United States citizen, was fluent in German, or understood the concept of the property regime she purportedly was selecting, or had received any legal advice or explanation of the document in advance. He even failed to ensure that the signatories' addresses were correct so that they would receive copies of the final document, leaving plaintiff without even the possibility of consulting with others about the terms of the agreement *after* signing it but before the wedding took place. The evidence establishes a classic case of overreaching, and the agreement should be vacated.