[25 NYS3d 90]

JACOB GOTTLIEB, Appellant-Respondent, v ALEXANDRA LUMIERE GOTTLIEB, Respondent-Appellant.

First Department, January 28, 2016

**APPEARANCES OF COUNSEL**

*Berkman Bottger Newman & Rodd, LLP*, New York City (*Walter F. Bottger* and *Jacqueline Newman* of counsel), for appellant-respondent.

*Law Office of William S. Beslow*, New York City (*William S. Beslow* and *Aimee M. Maddalena* of counsel), for respondent-appellant.

**OPINION OF THE COURT**

RICHTER, J.

In anticipation of their planned marriage, plaintiff Jacob Gottlieb (the husband) and defendant Alexandra Lumiere Gottlieb (the wife) entered into a prenuptial agreement. The agreement was the product of months of negotiations among the parties and their attorneys, and provided for, in the event of a divorce, the distribution of assets, spousal maintenance and health insurance, inheritance rights, and the purchase by the husband of a luxury apartment in which the wife and children would reside. Prior to the agreement's execution, the wife's counsel, an experienced matrimonial practitioner, advised her not to sign it, but the wife ignored that advice.

After the parties' marriage broke down, the husband filed this divorce action and the wife moved to set aside the agreement, claiming it was the product of overreaching resulting in manifestly unfair terms. The motion court dismissed the wife's claim that the entire agreement is unenforceable, but reserved for trial the limited issue of whether the agreement's maintenance provisions could be enforced. For the reasons that follow, we reject all of the wife's challenges to the agreement, and issue declarations in the husband's favor upholding the agreement and all its provisions. We also vacate the court's award of interim counsel fees to the wife and remand the matter for further proceedings on that issue.

The wife, now 37 years old, was born in New York City, attended private schools in Manhattan and Connecticut, and received a bachelor's degree in economics from the University of Pennsylvania. After working for several years in advertising and finance, she decided to pursue a real estate career, and obtained a salesperson's license and a position with Brown Harris Stevens, Inc. She later obtained a certification enabling her to teach yoga classes, but has not worked outside the home for several years. The husband, now 44 years old, also grew up in New York City, and obtained a bachelor's degree from Brown University and a medical degree from New York University School of Medicine. After working as a portfolio manager for various financial firms, he started a hedge fund, of which he is currently majority owner.

The parties met in September 2003, began living together in the beginning of 2004, and became engaged in September 2005. Prior to the engagement, the husband told the wife that he would not marry her unless there was a prenuptial agreement,

and the parties began to discuss terms. In October 2005, while negotiations were ongoing, the wife learned that she was pregnant. She told the husband that she did not want to have a child out of wedlock, and asked to finalize the prenuptial agreement so that they could marry before the child was born.

The parties discussed the terms of the prenuptial agreement many times during the wife's pregnancy, but no agreement was reached. In mid-March 2006, after consulting with a number of attorneys, the wife retained the services of a partner in a prominent New York matrimonial firm. The husband, however, told the wife that, on the advice of his attorney, he would not finalize the prenuptial agreement, or marry her, until after the child was born. In May 2006, the wife gave birth to a daughter, and the negotiations temporarily abated.

In the fall of 2006, the wife asked her attorney to resume negotiations and finalize the terms of the agreement. In early 2007, the husband's counsel sent a draft agreement to the wife's counsel. In a letter dated March 2, 2007, the wife's attorney proposed changes to the draft, many of which were incorporated into the final agreement. The letter states that the wife "understands all that she is potentially giving up by virtue of this Agreement."

In April 2007, the wife learned that she was pregnant again, and told her counsel that she wanted to execute a prenuptial agreement as soon as possible. Counsel for both parties continued negotiating. In a letter dated April 20, 2007, the husband's counsel sent the wife's counsel a list of revisions to the draft agreement, incorporating many of the changes that had been proposed by the wife's counsel. The husband's counsel also sent a statement outlining the husband's financial circumstances. On April 27, 2007, the wife went to her counsel's office and signed the agreement. The wife concedes that she ignored her counsel's advice not to sign the agreement. Several days later, the husband executed the agreement. The parties were married in May 2007 and their second daughter was born in November 2007.

The prenuptial agreement states that each party had legal counsel of his or her own choosing "who advised him or her fully with respect to his or her rights in and to the property and income of the other and with respect to the effect of this Agreement and that such party understands such advice." Each party acknowledged that the agreement was "fair and reasonable and not unconscionable," and was entered into "freely and

voluntarily and not as a result of fraud, duress, coercion, pressure or undue influence exercised by the other." The agreement also stated that the parties had been advised that they might acquire other rights granted to divorcing spouses, but that such rights could be limited or forfeited by the terms of the agreement.

The agreement defines marital property as (i) all property held jointly by the parties; and (ii) any property agreed to by the parties in writing. Separate property is defined in the agreement as all other property, including business interests, retirement benefits, professional licenses and educational degrees, income earned during the marriage, and any interest in the increase in value of the parties' separate property. Although each party waived any right to equitable distribution, the agreement provided for the following in lieu of a distributive award. First, for each year of the marriage (up to a maximum of 15 years), the husband agreed to deposit into an investment account the sum of $300,000. In the event of divorce, the wife would receive these funds along with any accrued interest. Next, the parties agreed to divide equally all wedding gifts, and real property and financial accounts registered in both parties' names. Any other marital property would be divided in proportion to each party's financial contribution to the asset.

Further, if there were minor children of the marriage at the time of divorce, the husband agreed to purchase, at his total cost and expense, an apartment for the use of the wife and the children. The apartment was required to be in a full-service doorman building located between 60th and 80th Streets and Third Avenue and Broadway, above the third floor and with one bedroom each for the wife and the children.[1] The husband agreed to pay the maintenance charges, utilities, and other expenses of the apartment, until all of the children reached the age of majority, at which point the wife would vacate the apartment. The husband also is obligated to pay the wife's and children's moving expenses to the apartment. The agreement also provides that two specified Manhattan apartments, including the residence occupied by the parties during their relationship, shall remain the husband's separate property.

---

1. The agreement also provided that if the marriage lasted 10 years, and there were no living issue of the marriage at the time of divorce, the husband would purchase, in the wife's name, a one-bedroom apartment in the same location and with the same attributes.

With respect to spousal support, the parties each acknowledged that in light of his or her assets, education, employment history, and rights under the agreement, he or she is "self-supporting and has sufficient ability to maintain a reasonable and satisfactory standard of living." Nevertheless, in the event of divorce, the husband agreed to pay the wife, as taxable maintenance, the sum of $12,500 per month, as long as there is a child of the marriage under the age of four. This amount was in addition to the husband's agreement to purchase, and pay all costs for, an apartment for the wife to live in. The husband also agreed to pay, as nontaxable maintenance, the wife's health insurance, until the parties' children are emancipated. Aside from these provisions, the parties waived any additional spousal maintenance and acknowledged that such waiver was fair and reasonable. In addition, in the spousal support section of the agreement, the wife waived any right to counsel fees, both interim and final.

The agreement also provided for certain inheritance rights for the wife and children. The parties agreed that if the marriage was still intact at the time of the husband's death, the wife would receive her elective share of the husband's estate. In the event of divorce, the husband agreed to leave, either outright or in trust, a specified percentage of his estate to the children of the marriage. Finally, financial statements annexed to the agreement list each parties' assets, liabilities and net worth, although the parties' incomes were not included. The husband and the wife explicitly acknowledged that, upon being advised by counsel, each fully understood the financial information provided by the other, and recognized that their financial circumstances could be considerably different at the time of dissolution of the marriage.

The marriage ultimately broke down, and in August 2012 the husband brought this action for divorce. In her answer, the wife asserts four counterclaims. The first counterclaim seeks a declaration that the entire prenuptial agreement is invalid and unenforceable. The fourth counterclaim seeks rescission of the agreement based on a purported mutual mistake concerning the cost of the apartment the husband was obligated to purchase for the wife. The second and third counterclaims, asserted in the alternative to the first and fourth counterclaims, seek, respectively, declarations that the agreement's maintenance provisions were unfair when the agreement was executed and are currently unconscionable, and that the agreement's

property distribution provisions were unfair as of the execution date.

The wife moved for partial summary judgment on her first counterclaim seeking a declaration that the entire prenuptial agreement is invalid. The wife argued that the agreement was not enforceable because it was the product of overreaching by the husband that resulted in manifestly unfair terms. In her affidavit in support of the motion, the wife expressly acknowledged that she does not seek to invalidate the agreement based on unconscionability, coercion, duress or fraud. The husband cross-moved for partial summary judgment dismissing the wife's four counterclaims.

The motion court denied the wife's motion, and granted the husband's cross motion to the extent of dismissing the wife's first counterclaim attacking the validity of the entire agreement and the third counterclaim challenging the property distribution provisions. The court, however, denied dismissal of the wife's second counterclaim seeking to invalidate the maintenance provisions, and reserved for trial the issues of whether those provisions were fair and reasonable when entered into and whether they are unconscionable today.[2] Both parties now appeal.

The wife, on her appeal, contends that the motion court erred in denying her motion to set aside the prenuptial agreement. The standards for assessing the validity of a prenuptial agreement are well-settled. A strong public policy exists in favor of parties deciding their own interests through premarital contracts, and a duly executed prenuptial agreement is given the same presumption of legality as any other contract (*Bloomfield v Bloomfield*, 97 NY2d 188, 193 [2001]; *Matter of Greiff*, 92 NY2d 341, 344 [1998]). Thus, a prenuptial agreement "is presumed to be valid and controlling unless and until the party challenging it meets his or her very high burden to set it aside" (*Anonymous v Anonymous*, 123 AD3d 581, 582 [1st Dept 2014]).

Despite the presumption of validity, an agreement between prospective spouses can be set aside where it is shown to be the product of fraud, duress, overreaching resulting in manifest unfairness, or other inequitable conduct (*see Christian v Christian*, 42 NY2d 63, 72 [1977]). In the absence of such inequitable conduct, however, courts should not redesign the bargain

2. The wife withdrew the fourth counterclaim during oral argument before the motion court.

reached by the parties merely because in retrospect the provisions might be viewed as improvident or one-sided (*id.*). Rather, judicial review should be "exercised circumspectly, sparingly and with a persisting view to the encouragement of parties settling their own differences in connection with the negotiation of property settlement provisions" (*id.* at 71-72). The setting aside of a prenuptial agreement is "the exception rather than the rule," and the burden of establishing fraud, duress or overreaching is on the party seeking to set aside the agreement (*Anonymous*, 123 AD3d at 582).

Here, the wife's motion did not challenge the prenuptial agreement on the ground that it is the product of coercion, duress or fraud. Nor did the wife argue that the agreement's terms as a whole are unconscionable. Rather, her only claim was that the agreement is manifestly unfair due to the husband's overreaching (*see Christian*, 42 NY2d at 72). Although no actual fraud need be shown to set aside the agreement on this ground, the challenging party must show overreaching in the execution, such as the concealment of facts, misrepresentation, cunning, cheating, sharp practice, or some other form of deception (*see id.*; *Stawski v Stawski*, 43 AD3d 776, 777 [1st Dept 2007]; *Matter of Baruch*, 205 Misc 1122, 1124 [Sur Ct, Suffolk County 1954], *affd* 286 App Div 869 [2d Dept 1955]). In addition, the challenging party must show that the overreaching resulted in terms so manifestly unfair as to warrant equity's intervention (*see Levine v Levine*, 56 NY2d 42, 47 [1982] [to set aside agreement, both overreaching and manifest unfairness must be demonstrated]; *Christian*, 42 NY2d at 72; *Barocas v Barocas*, 94 AD3d 551 [1st Dept 2012], *appeal dismissed* 19 NY3d 993 [2012]; *Bronfman v Bronfman*, 229 AD2d 314, 315 [1st Dept 1996] [challenger of agreement bears "very high burden" of showing that it is manifestly unfair and that such unfairness was the result of overreaching]).

Judged by these standards, the wife has failed to meet her heavy burden to set aside the prenuptial agreement. No issue of fact exists as to whether the husband engaged in overreaching during the negotiations leading up to the execution of the agreement. The agreement was the product of on and off discussions that took place over the course of more than a year and a half. Although initially the parties negotiated by themselves, about midway through, the wife retained the services of a partner in a prominent matrimonial firm. Negotiations continued by the parties and their attorneys, with draft agree-

ments exchanged and terms modified. Both the fact that the wife was an active participant in the negotiations, and was the one who was pushing to get the agreement signed, are hard to reconcile with her current claim of overreaching.

There is no basis to conclude that the wife did not have sufficient time to review the agreement, or that she did not understand its terms. Although the wife maintains that she suffered from depression and anxiety at the time the agreement was signed, no showing has been made that she lacked the mental capacity to understand the agreement, or that she suffered from a psychological impairment that prevented her from making a reasoned decision. Indeed, the motion court noted that the wife's counsel, in the papers below, stated that she was not claiming any medical or psychological disability at the time she signed the agreement. In addition, neither of the medical professionals who submitted affidavits expressed the opinion that the wife was incapable of understanding the agreement or the consequences of executing it. And when it came time to execute the agreement, the wife admittedly ignored the advice of her own independent counsel and signed it. In view of all these circumstances, we conclude that no inference of overreaching exists (*see Barocas*, 94 AD3d at 551-552 [execution of prenuptial agreement not the result of inequitable conduct where, inter alia, agreement was knowingly entered into against counsel's advice]; *Strong v Dubin*, 48 AD3d 232, 232-233 [1st Dept 2008] [prenuptial agreement enforceable where, inter alia, counsel told the defendant that the agreement appeared one-sided, and the defendant responded "It's okay. I just want to get married"]).

The wife complains that she was unaware of the husband's exact income at the time she executed the agreement. However, the mere fact that the husband did not include his income in his financial disclosure, standing alone, is not a basis to set the agreement aside (*see Strong*, 48 AD3d at 233 ["A failure to disclose financial matters, by itself, is not sufficient to vitiate a prenuptial agreement"]). Notably, there is no claim by the wife that the husband concealed or misrepresented his income (*see id.*; *Cohen v Cohen*, 93 AD3d 506 [1st Dept 2012]). Further, as the motion court noted, the wife lived with the husband and was aware of the luxurious lifestyle his income and assets afforded, even if the precise amount of the income was unknown to her (*see Matter of Fizzinoglia*, 118 AD3d 994, 996 [2d Dept 2014], *affd* 26 NY3d 1031 [2015] [record indicates that the

petitioner-wife was personally acquainted with the nature of the decedent-husband's assets before signing the agreement, and there was no indication that the decedent had at any time attempted to conceal or misrepresent the nature or extent of his assets]; *Strong v Dubin*, 48 AD3d at 233). Moreover, the substantial financial disparity between the parties was fully disclosed at the time the agreement was executed (*Smith v Walsh-Smith*, 66 AD3d 534, 535 [1st Dept 2009], *lv denied* 14 NY3d 704 [2010]). Contrary to the dissent's suggestion that there was inadequate financial disclosure, a statement attached to the agreement lists the husband's assets, liabilities and net worth, and the wife, who has a degree in economics and has worked in the finance field, specifically acknowledged in the agreement that she fully understood the information provided.

The wife claims on appeal that the agreement was procured through two instances of fraudulent conduct on the husband's part. At the outset, we note that in her submissions below, the wife explicitly disclaimed that her motion was based on fraud. Thus, her current claims of fraud are not properly before us. In any event, they provide no basis to set aside the agreement. The first alleged fraud centers around the apartment the husband was obligated to purchase for the wife. During negotiations, the parties agreed that the purchase price for the apartment would not exceed 120% of the mean price of a comparable apartment. Due to an apparent typographical error, however, the agreement mistakenly stated "20%" instead of "120%."

The wife states that she did not notice this error prior to execution of the agreement, but alleges that the husband did and he failed to correct it. The record, however, contains no evidentiary support for these allegations. The husband readily admits that the parties had agreed on the 120% figure and that the agreement contains an error, and acknowledges his present obligation to purchase an apartment within that price range. It is hard to understand how the husband's alleged conduct would amount to fraud in light of the wife's acknowledgment that she did not even notice the error (*see Lemle v Lemle*, 92 AD3d 494, 499 [1st Dept 2012] ["an essential element of fraud is justifiable reliance upon the representations made"]). In any event, even if the husband failed to correct the error before the agreement was signed, the equitable remedy would not be to invalidate the entire agreement, but to require

the husband to abide by the 120% cost cap, an obligation he fully accepts.[3]

The wife fares no better with her second claim of alleged fraud, which centers around the inheritance rights contained in the agreement. The agreement provides that, in the event of divorce, the children of the marriage will receive a portion of the husband's estate, either outright or in trust. The wife alleges that the husband deceptively included the "in trust" language contrary to the parties' prior understanding. However, the record does not support the wife's contention that the parties had agreed that the children would receive their inheritance outright. In fact, the parties' communications on this point addressed only the amount of the inheritance, and not the form in which it would be conveyed.[4] Moreover, it is difficult to understand how this would constitute grounds sufficient to invalidate the agreement. The provision only governs the husband's financial obligations to his children in the event of his death, and does not involve any issues related to the wife's financial welfare if the marriage is dissolved during his lifetime.

There is no merit to the wife's contention that the husband's behavior during her two pregnancies warrants setting aside the agreement. According to the wife, the husband told her that he would not enter into a prenuptial agreement, and thus would not marry her, until after the birth of their first child. The wife further alleges that the husband told her that he would end their relationship if she terminated her second pregnancy. This Court has held, however, that similar behavior is insufficient to invalidate a prenuptial agreement. For example, in *Cohen* (93 AD3d at 506), we held that a threat to a pregnant woman to cancel the wedding if she refused to sign the agreement provided no basis to set the agreement aside. Likewise, in *Barocas* (94 AD3d at 551), we declined to invalidate a prenuptial agreement where the wife believed that there would be no wedding if she did not sign the agreement (*see*

---

**3.** Although not in the record on appeal, subsequent motion practice in this Court reveals that, in compliance with his obligation under the agreement, the husband purchased an $8.7 million apartment for the wife and children to live in.

**4.** The wife also complains that her counsel was ineffective for failing to notice both the trust provision and the error about the cost of the apartment. Even if true, that would have no bearing on whether the husband engaged in overreaching. We also reiterate that the wife ignored her counsel's advice not to sign the agreement.

*also Weinstein v Weinstein*, 36 AD3d 797, 799 [2d Dept 2007]; *Colello v Colello*, 9 AD3d 855, 858 [4th Dept 2004]). We cannot set aside the agreement here merely because the husband's repeated refusal to marry his then-pregnant fiancée without a prenuptial agreement might be viewed by some as callous. The wife's argument that she had no meaningful choice due to the husband's actions is belied by the fact that she knowingly entered into the agreement against the advice of her counsel (*see Barocas*, 94 AD3d at 552).

Because the circumstances surrounding the execution of the agreement raise no issue of fact as to whether there was overreaching, we need not inquire into whether the terms of the agreement are manifestly unfair (*see Christian*, 42 NY2d at 73 ["If the execution of the agreement (is) fair, no further inquiry will be made"]; *Barocas*, 94 AD3d at 551). However, because the dissent addresses this issue, we note that the wife has also failed to make the requisite showing that the agreement's terms are manifestly unfair. Under the agreement, the wife is entitled to, in lieu of equitable distribution, the sum of $300,000, along with interest, for each year of the marriage. Further, the agreement provides that all real property and financial accounts in both parties' names would be equally divided, and other marital property would be divided in proportion to each party's financial contribution to the asset.

With respect to spousal support, the agreement provided the wife with $12,500 per month until the youngest child reached the age of four. Although there was no provision for a regular monthly payment thereafter, the agreement provided the wife with free luxury housing (including maintenance, utilities and other expenses) until the youngest child turns 18, along with free health insurance during that time. And, if the parties had no living children at the time of the divorce, the husband would be obligated, if the marriage lasted 10 years, to purchase an apartment for the wife in her own name. The agreement also ensured that, if the marriage was intact at the time of the husband's death, the wife would receive her elective share of his estate. Finally, although not inuring to the wife's benefit, the agreement provided inheritance rights for the children.

Viewing the parties' prenuptial agreement in its entirety, it cannot be said that its terms are manifestly unfair. This Court cannot invalidate the agreement merely because the husband has more than enough assets to give the wife additional funds. Although, at the end of the day, a significant financial dispar-

ity will exist between the parties to this relatively short marriage, any such inequality is simply not a basis for vitiating their freely-negotiated agreement (*see Barocas*, 94 AD3d at 551 [upholding agreement where wealthier spouse retained essentially all of the assets acquired during the marriage]). The wife bargained for the benefits she would receive in the event of a divorce, and we decline to undo the agreement merely because she may now, in retrospect, view her choices as having been improvidently made (*see Barnes-Levitin v Levitin*, 131 AD3d 987, 988 [2d Dept 2015] ["A( ) (prenuptial) agreement will not be overturned merely because, in retrospect, some of its provisions were improvident or one-sided"]; *Herr v Herr*, 97 AD3d 961, 963 [3d Dept 2012], *lv dismissed* 20 NY3d 904 [2012] ["(the wife) was fully aware of the rights she was waiving at the time she signed the agreement and, . . . an agreement will not be set aside simply because a party relinquished more than the law would have provided"]). Moreover, neither the wife nor the dissent cites to any case in which a premarital agreement has been found to be manifestly unfair where it provides a spouse with the financial benefits the wife is receiving in this case.

Although the dissent concludes that it is premature to rule on the validity of the parties' prenuptial agreement because there are triable issues of fact, it fails to identify any specific facts that would, under the case law, require invalidation of the agreement after a trial. Contrary to the dissent's view, our decision upholding the agreement does not turn on the parties' credibility. Rather, for the purpose of this decision, we accept as true the wife's description of the circumstances underlying the execution of the agreement, and conclude that her claims do not support a finding of overreaching.

The wife's description of herself as being in the "precarious position of negotiating as an unmarried mother," a view impliedly adopted by the dissent, is at odds with the fact that she was represented by experienced matrimonial counsel who negotiated the agreement over an extended period of time. Likewise, the dissent all but ignores the fact that the wife, an educated college graduate, signed the agreement against the express advice of her own counsel. Although the dissent decries the husband's negotiation style, the fact that he may have modified his initial offers can hardly be seen as overreaching where the wife was represented by counsel, who might have been able to continue negotiations if the wife had followed her advice not to sign the agreement.

In questioning the fairness of the separate property provisions of the agreement, the dissent states that the parties intended the wife to raise the children full-time as a stay-at-home spouse. In fact, the record suggests just the opposite. In the agreement, the wife explicitly acknowledged that in light of her assets, education, employment history, and her rights under the agreement, she is "self-supporting and has sufficient ability to maintain a reasonable and satisfactory standard of living." Further, the husband's maintenance obligations, if the parties did not stay together, remained only so long as there is a child under the age of four. This is a strong indicator that the parties intended the wife to return to the workforce when the children started school.

As noted earlier, the husband is obligated to provide a luxury apartment for the wife and children until the last child reaches the age of majority. The dissent finds this provision manifestly unfair because the wife could lose the apartment in the event she decided to give full custody to the husband such that the children would no longer live with her even part of the time. However, the parties voluntarily settled the issue of legal custody and parenting time, and agreed that the wife would have primary residential custody of the children. The dissent engages in pure speculation by suggesting that the parties plan to change their current custody arrangement, or that the children will not be residing at all with the wife going forward.[5]

We do not share the dissent's view that the terms of a prenuptial agreement are manifestly unfair merely because a party may enjoy a less lavish lifestyle upon divorce than existed during the marriage. It appears that the dissent presupposes that the purpose of a prenuptial agreement is to equitably divide up the parties' assets, and to maintain the marital standard of living for the lesser-monied spouse. That, however, is the purpose of the statutory scheme (*see* Domestic Relations Law § 236 [B] [5], [6]), and is not the reason why most prospective spouses enter into prenuptial agreements. We also disagree with the dissent's position that a prenuptial agreement can be set aside if its terms do not match "the degree of economic interdependence" the parties shared during the marriage. That

---

**5.** Contrary to the dissent's view, the fact that the wife oversaw the renovations of the apartment in which the parties ultimately resided has no bearing on the parties' intent at the time the prenuptial agreement was signed. Nor does it call into question the validity of the clear and unequivocal separate property provisions of the agreement.

standard, which the dissent does not support with any case law, could result in the undoing of the vast majority of marital agreements. The dissent fails to recognize that a party may have legitimate reasons for not wanting to give assets to an ex-spouse, regardless of how the couple managed their money during the marriage. For example, in many cases, prenuptial agreements are used to preserve assets so that they are available for children of the current, or a former, marriage.

It goes without saying that premarital agreements often involve substantial financial disparities between the parties, with the more-monied party seeking to protect his or her assets and business interests. If the unequal division of assets, or the failure to maintain the marital lifestyle, were to be the test used to determine validity, it would inevitably result in the setting aside of many, if not most, prenuptial agreements. The criteria focused on by the dissent include some of the statutory factors used to determine equitable distribution and maintenance awards in a contested divorce proceeding, but here the parties decided not to avail themselves of that statutory scheme. We recognize that there comes a point when the imbalance is so extreme that it is appropriate for equity to intervene. This, however, is not such a case.

Contrary to the dissent's implication, the Court of Appeals' decision in *Christian* (42 NY2d 63) does not hold that a prenuptial agreement is manifestly unfair when it does not result in a continuation of the marital standard of living. According to the dissent, that test finds support in *Ducas v Guggenheimer* (90 Misc 191 [Sup Ct, NY County 1915], *affd sub nom. Ducas v Ducas*, 173 App Div 884 [1st Dept 1916]), a trial level decision from 1915. Although *Christian* cited to *Ducas*, it did so for an entirely different proposition with which we agree—that agreements between spouses involve a fiduciary relationship requiring the utmost of good faith. In no way does *Christian* support the dissent's position that prenuptial agreements are manifestly unfair merely because there is an appreciable reduction in the marital standard of living or a significant disparity in the allocation of assets.

*Petracca v Petracca* (101 AD3d 695 [2d Dept 2012]), a case cited by the dissent, is distinguishable on its facts. In *Petracca*, the Court set aside a postnuptial agreement where there were gross inaccuracies in the husband's financial disclosures, and the wife had only a few days to review the agreement, did not understand it, and did not have counsel, all factors not present

here. Although the Court also discussed the disparity in the parties' net worth, it did not establish any bright-line rule mandating the invalidation of marital contracts based solely on financial imbalances. We note too that, unlike here, there is no indication that the wife in *Petracca* was entitled to distributive payments or free housing and health insurance.

*Matter of Greiff* (92 NY2d 341), relied upon by the wife, does not require a different result. In *Greiff*, the Court of Appeals, while affirming the principle that prenuptial agreements are not subject to any special evidentiary burdens, recognized that in "exceptional circumstances," the special relationship between engaged parties may shift the burden of persuasion to the proponent of the agreement to show freedom from overreaching (*id.* at 343, 344). In order for the burden to shift, however, the spouse contesting a prenuptial agreement must establish "a fact-based, particularized inequality" and must demonstrate that the "premarital relationship between the contracting individuals manifested 'probable' undue and unfair advantage" (92 NY2d at 343, 346). Here, no burden shifting is warranted because, for the reasons already discussed, the wife has failed to show any such inequality or undue and unfair advantage (*see Matter of Barabash*, 84 AD3d 1363, 1364 [2d Dept 2011]; *Strong*, 48 AD3d at 232; *Matter of Greiff*, 262 AD2d 320, 321 [2d Dept 1999], *lv denied* 93 NY2d 817 [1999]).

We disagree with the concurrence's view that because the parties were not married at the time the agreement was executed, the manifest unfairness standard set forth in *Christian* (42 NY2d 63) has no applicability here. In *Matter of Greiff* (92 NY2d 341), the Court of Appeals spoke of "the unique character of the inchoate bond between prospective spouses—a relationship by its nature permeated with trust, confidence, honesty and reliance" (*id.* at 347; *see also Rosenzweig v Givens*, 13 NY3d 774, 775 [2009] [recognizing that a couple can have a fiduciary relationship before marriage]; *Robinson v Day*, 103 AD3d 584, 585 [1st Dept 2013] [romantic companions of 14 years were in confidential relationship of trust and confidence]; *Colello v Colello*, 9 AD3d 855, 858-859 [4th Dept 2004] ["(the) defendant had a fiduciary relationship with (the) plaintiff both as her fiancé and as her spouse"]).

Recognizing the nature of this special relationship, courts have specifically applied *Christian*'s manifest unfairness standard to prenuptial agreements (*see e.g. Lombardi v Lombardi*, 127 AD3d 1038, 1041 [2d Dept 2015]; *Bibeau v Sudick*,

122 AD3d 652, 654-655 [2d Dept 2014]). Here, the undisputed facts show that the parties shared a fiduciary relationship. At the time the prenuptial agreement was entered into, the parties were engaged, had been living together for more than three years, had a child together, and were expecting another.[6] Thus, their relationship was "permeated with trust, confidence, honesty and reliance" (*Greiff*, 92 NY2d at 347) sufficient to make them fiduciaries.[7] We do not share the concurrence's belief that the husband's negotiating style and his behavior during the engagement negates the existence of a fiduciary relationship between the parties. That position would make it difficult to ever find a fiduciary relationship between couples with significant assets whose marital agreements are sharply negotiated.

On his appeal, the husband challenges the motion court's decision to order a trial on the validity of the agreement's maintenance provisions. Domestic Relations Law § 236 (B) (3) provides that a prenuptial agreement may include provisions governing maintenance provided they "were fair and reasonable at the time of the making of the agreement and are not unconscionable at the time of entry of final judgment" (Domestic Relations Law § 236 [B] [3] [3]; *see Anonymous*, 123 AD3d at 584).[8] For the reasons already discussed, and as the parties explicitly acknowledged in the agreement, the maintenance provisions here were neither unfair nor unreasonable at the time the agreement was entered into (*see Barocas*, 94 AD3d at 552 [in light of the wife's knowing and voluntary execution of prenuptial agreement with benefit of counsel, waiver of spousal support was not unfair or unreasonable at time agreement signed]; *Markovitz v Markovitz*, 29 AD3d 460, 461 [1st Dept 2006] [agreement upheld where, inter alia, the parties represented that they considered the agreement fair]).

---

**6.** We need not decide whether a fiduciary relationship would exist where an affianced couple had little or no relationship prior to executing a prenuptial agreement.

**7.** The concurrence also questions the significance of *Christian* in light of the subsequent enactment of the Equitable Distribution Law. This argument was not raised by either party on appeal. Moreover, trial and appellate courts throughout the state have consistently applied *Christian* to marital agreements entered into after the Equitable Distribution Law became effective.

**8.** That statutory provision also makes maintenance provisions subject to the requirements of section 5-311 of the General Obligations Law, which prohibits agreements that relieve either spouse of the support obligation such that the other is likely to become a public charge. Here, there is no claim that the wife runs the risk of becoming a public charge.

Nor are the maintenance provisions unconscionable as applied to the present circumstances. An agreement will be viewed as unconscionable only "if the inequality is so strong and manifest as to shock the conscience and confound the judgment of any [person] of common sense" (*McCaughey v McCaughey*, 205 AD2d 330, 331 [1st Dept 1994] [internal quotation marks omitted]; *see also Christian*, 42 NY2d at 71 [an unconscionable agreement is one which no person in his or her senses and not under delusion would make on the one hand, and which no honest and fair person would accept on the other]). Judged by these standards, no unconscionability exists. Although the wife is not currently entitled to a specific monthly maintenance payment, she effectively is receiving nontaxable maintenance by way of other benefits provided for in the agreement. She gets a shelter allowance until the children reach majority (i.e., for the next 10 years), in the form of rent-free, expense-free luxury housing, and she is also entitled to, during that same period, free health insurance.

Moreover, under the agreement, the wife, after only five years of marriage, will receive a monetary distribution from the investment account set up and funded by the husband. The value of that account, as of January 2013, was approximately $1.6 million. This amount is in addition to the wife's listed net worth, as of that same date, of approximately $1.5 million. Thus, the wife will have at her disposal at least $3.1 million in assets, with no housing or health insurance costs, because those costs are being paid by the husband. In addition, although no final child support order had been issued at the time this appeal was heard, the husband has proposed paying $9,000 per month in child support, plus 100% of reasonable child care, health insurance, unreimbursed medical, dental and optical expenses, private school, Hebrew school, tutoring, summer camp, extracurricular activities and college tuition, room and board.

In view of the wife's current financial circumstances, along with the $1.6 million and other benefits she will be receiving in the future from the husband, it cannot be said that the agreement's maintenance provisions shock the conscience. The wife is only 37 years old, and has an economics degree from the University of Pennsylvania and prior experience in real estate and finance. In the agreement, she explicitly acknowledged that in light of, inter alia, her education and employ-

ment history, she is "self-supporting and has sufficient ability to maintain a reasonable and satisfactory standard of living." Thus, there is no reason why she cannot in the future reenter the workforce to supplement the benefits she will receive under the agreement.

The husband's appeal also challenges the court's award of interim counsel fees to the wife. In a motion sequence separate from the one involving the prenuptial agreement, the husband sought exclusive occupancy of the marital residence, an order setting the amount of his child support obligation, and a protective order limiting further discovery. The wife opposed the motion and cross-moved for exclusive occupancy, temporary child support and an award of interim counsel fees. The affidavits in support submitted by the wife and her counsel made clear that the fee request was not made in connection with the litigation involving the validity of the prenuptial agreement. Rather, the wife sought fees of $30,000 for litigating the current motion sequence as well as $20,000 for unspecified additional legal work purportedly unrelated to issues involving the prenuptial agreement. As relevant here, the motion court granted the wife's motion and awarded interim counsel fees in the amount of $50,000.[9]

We reject the husband's contention that the wife's waiver in the prenuptial agreement of interim and final counsel fees bars any fee award. On appeal, the wife maintains that she is entitled to these counsel fees, which she says were awarded for litigating child-related matters. Because the prenuptial agreement does not cover child-related matters, the waiver does not preclude an award of counsel fees connected to litigating the child support issues raised in the motion (*see Vinik v Lee*, 96 AD3d 522, 523 [1st Dept 2012]). Likewise, legal fees related to the exclusive occupancy aspect of the motion are recoverable because the heart of that dispute is the children's best interests, and the place where the children will be living, which are child-related matters. However, because it is not clear what portion of the $50,000 sought is connected to child-related issues, the matter is remanded for further development of the

---

9. The parties do not challenge on this appeal the court's determination of the child support, exclusive occupancy or discovery issues raised in the motion.

record as to how much of the fee request involves those issues.[10]

We have considered the wife's remaining contentions and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Ellen Gesmer, J.), entered October 31, 2013, which, to the extent appealed from as limited by the briefs, denied defendant wife's motion for partial summary judgment on the first counterclaim, granted plaintiff husband's cross motion for partial summary judgment dismissing the first and third counterclaims and denied the cross motion to the extent it sought dismissal of the second counterclaim, and granted defendant's cross motion for interim counsel fees, should be modified, on the law and the facts, to deny the cross motion to dismiss the first and third counterclaims, to declare that the parties' prenuptial agreement is valid and enforceable, that the agreement's maintenance provisions were fair as of the date of execution and are not currently unconscionable, and that the agreement's property distribution provisions were fair as of the date of execution, to deny the cross motion for interim counsel fees, to vacate the award of such fees, to remand the matter for proceedings consistent herewith, and otherwise affirmed, without costs.

SAXE, J. (concurring). I agree with the result reached by the majority, and with much of the reasoning of that opinion. I write separately to suggest that the standard enunciated in *Christian v Christian* (42 NY2d 63 [1977]), relied on by both the majority and the dissent to assess the enforceability of the parties' prenuptial agreement, is not the correct analytical framework to use when considering prenuptial agreements, especially their property division provisions. Property division provisions of prenuptial agreements may be set aside only on grounds that would warrant the invalidation of any contract.

## Facts

The drawn-out process by which Mr. Gottlieb proposed and renegotiated the prenuptial agreement at issue here is fully laid out in my colleagues' writings, and need not be reiterated at length. It is enough to say that after first insisting on a

---

**10.** Because our decision in *Anonymous* (123 AD3d 581) was issued after this case was argued, the parties have not addressed the question of whether, despite the waiver, counsel fees for non-child-related matters can be awarded "as justice requires" (*id.* at 585).

prenuptial agreement, he then repeatedly reduced his offered terms, then declined to enter into an agreement while Ms. Lumiere Gottlieb was pregnant with the parties' first child, and only finally acceded to the execution of an agreement when Ms. Lumiere Gottlieb was pregnant with their second child.

The final agreement, executed by Ms. Lumiere Gottlieb against her attorney's advice, listed Ms. Lumiere Gottlieb's net worth as $610,817 and Mr. Gottlieb's net worth as $103,894,476. It limited the property to be treated as marital property as property titled in both parties' names as joint tenants or tenants by the entirety, along with any property agreed in writing by the parties to be marital property, and defined all other property as separate property, including income earned during the marriage, business interests, and the two apartments Mr. Gottlieb purchased before the marriage. Ms. Lumiere Gottlieb waived any interest in the increase in the value of Mr. Gottlieb's separate property, along with any rights under the Equitable Distribution Law. The only property distribution provided for by the agreement was that Ms. Lumiere Gottlieb would be entitled to payment of $300,000 for each year of the marriage, plus interest compounded annually at the rate of five percent. Pursuant to the agreement, Mr. Gottlieb was required to deposit sums into an account for this purpose during the marriage. The current value of that account is approximately $1,586,219.

Ms. Lumiere Gottlieb also waived spousal maintenance, except that if any minor children resided with Ms. Lumiere Gottlieb at the time of divorce, during the period in which a child of the marriage was under four years old, Mr. Gottlieb would pay spousal maintenance of $12,500 per month, and except that as long as a minor child resided with her, Mr. Gottlieb agreed to pay the carrying costs and utilities for an apartment (of a specified size, location and type) for Ms. Lumiere Gottlieb until the youngest child attained the age of majority, with all such payments to be treated as child support. Mr. Gottlieb also agreed to provide health insurance for Ms. Lumiere Gottlieb until the emancipation of the parties' children.

Mr. Gottlieb commenced this action for divorce in 2012, some five years after their marriage. In her answer, Ms. Lumiere Gottlieb interposed four counterclaims, the first seeking to declare the entire prenuptial agreement unenforceable, the second to set aide the maintenance provisions and the third to set aside the property distribution provisions. Her fourth

counterclaim concerned an error in a provision about the price of the apartment Mr. Gottlieb agreed to purchase for her and the children.

Ms. Lumiere Gottlieb moved, and Mr. Gottlieb cross-moved, for partial summary judgment on Ms. Lumiere Gottlieb's counterclaims. Ms. Lumiere Gottlieb contended that, as a matter of law, the prenuptial agreement was unenforceable as the product of overreaching causing manifest unfairness.

The motion court dismissed Ms. Lumiere Gottlieb's first and third counterclaims, but denied dismissal of her second cause of action, which challenged the enforceability of the agreement's maintenance provisions. The majority now holds that the dismissal of the first and third counterclaims was correct, and that the second counterclaim should have been dismissed as well. I agree, although for other reasons. The dissent adopts Ms. Lumiere Gottlieb's suggestion that a prenuptial agreement may be set aside if it is the product of overreaching causing manifest unfairness, and would require a hearing to determine whether to set aside the agreement based on that standard. I strongly take issue with dissent's analysis and its conclusion.

### Discussion

Both the majority and the dissent quote *Christian v Christian* for the proposition that "[t]o warrant equity's intervention, no actual fraud need be shown, for relief will be granted if the settlement is manifestly unfair to a spouse because of the other's overreaching" (*id.* at 72), relying on that statement to hold that prenuptial agreements may be set aside (1) if they are the product of "overreaching" and, if so, (2) if they are "manifestly unfair." Unlike my colleagues, I submit that it is not appropriate to look to *Christian* for the current standard for judging the enforceability of prenuptial agreements' property division provisions.

There are two important points to recognize about the *Christian* decision. First, *Christian* was issued in 1977, so its analysis of this issue must, of necessity, be informed by the provisions of the subsequent Equitable Distribution Law, enacted in 1980, which provides its own approach for judging the enforceability of marital agreement provisions. While the dissent repeatedly characterizes my position as advocating that the statute "supersedes" the *Christian* ruling, I simply point out that instead of automatically applying the *Christian* standard, we should recognize that in Domestic Relations Law § 236 (B) (3)—enacted after *Christian* was decided—the

legislature explicitly and implicitly provided standards by which to determine the enforceability of the various components of prenuptial agreements.

Second, *Christian* was concerned only with separation agreements between spouses, and its reasoning applied only to married couples who enter into separation agreements; it was not intended to apply to not-yet-married, affianced couples, and there is scant support for extending its application in that way.

Domestic Relations Law § 236 (B) (3) creates a different standard than the rule stated in *Christian*. In contrast to *Christian*'s requirement of special scrutiny for separation agreements between a married couple, the statute explicitly authorizes and approves of agreements made both before and during a marriage, setting a baseline by which such agreements are deemed valid and enforceable as long as they are "in writing, subscribed by the parties, and acknowledged or proven in the manner required to entitle a deed to be recorded" (*id.*).

Importantly, while section 236 (B) (3) requires additional scrutiny for particular types of provisions in marital agreements, specifically, maintenance and child-related provisions, the statute makes no provision at all for heightened scrutiny of property division aspects of marital agreements. By imposing a specified heightened standard for support provisions, but not affirmatively imposing any such standard for property division provisions, we may infer, through the principle of *expressio unius est exclusio alterius*, that the legislature intended *not* to apply any such heightened standard to property division provisions of marital agreements (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 240).

So, while Domestic Relations Law § 236 (B) (3) sets special standards by which to review maintenance and child support provisions of prenuptial agreements, the absence of a heightened standard in the statute for property provisions indicates that a heightened standard should not be applied when judging property provisions. The *Christian* analysis, which looks for overreaching and then manifest unfairness, creates a standard similar to the section 236 (B) (3) standard for judging maintenance provisions, with *Christian*'s "manifest unfairness" component approximating the "fair and reasonable" component of the statute's maintenance standard, while *Christian*'s "overreaching" component approximates the (procedural) "unconscionability" prong of the statute's standard for judging maintenance provisions. Since *Christian*'s analysis imposes a

heightened standard, while section 236 (B) (3) requires that property provisions be judged by ordinary standards for contract enforcement, the use of *Christian*'s standards for judging property provisions is incorrect.

In insisting that the *Christian* standard must be employed here, the dissent relies on *Goldman v Goldman* (118 AD2d 498 [1st Dept 1986]), which does not provide any support for its point. *Goldman* involved an action to set aside a reconciliation agreement, which is not an agreement to which Domestic Relations Law § 236 (B) (3) applies, so its facts were virtually the converse of the situation presented here, and its use of the analysis provided by *Christian v Christian* was therefore uniquely appropriate there, as opposed to the circumstances of this appeal.

Even if the *Christian* pronouncement survived the Equitable Distribution Law, it would have no applicability to prenuptial agreements. It was the spousal relationship of the parties that prompted the *Christian* Court to explain that "separation agreements subjected to attack are tested carefully" (42 NY2d at 65) and that "a separation agreement may be set aside on grounds that would be insufficient to vitiate an ordinary contract" (*id.* at 72). In support of its premise regarding the special treatment of separation agreements, it quoted a 1889 Court of Appeals decision for the proposition that " '[a] court of equity . . . inquires whether the contract [between husband and wife] was just and fair, and equitably ought to be enforced, and administers relief where both the contract and the circumstances require it' " (*id.* at 65, quoting *Hendricks v Isaacs*, 117 NY 411, 417 [1889]).

Indeed, when the Court of Appeals has discussed the *Christian* decision, it has explained that "because of the *fiduciary relationship between husband and wife*, separation agreements generally are closely scrutinized by the courts, and such agreements are more readily set aside in equity under circumstances that would be insufficient to nullify an ordinary contract" (*Levine v Levine*, 56 NY2d 42, 47 [1982] [emphasis added], citing *Christian v Christian*, 42 NY2d at 72, and *McGahee v Kennedy*, 48 NY2d 832, 834 [1979]). Similarly, cases of this and other Departments applying *Christian*'s standard for setting aside marital agreements on the ground that they are "manifestly unfair to a spouse because of the other's overreaching" have most often involved agreements between spouses (*see e.g.*

*Petracca v Petracca*, 101 AD3d 695, 698 [2d Dept 2012] [internal quotation marks omitted]; *Kleinman v Kleinman*, 289 AD2d 18 [1st Dept 2001], *lv denied* 98 NY2d 610 [2002]; *Gibson v Gibson*, 284 AD2d 908 [4th Dept 2001]).

It is the fiduciary nature of the marital relationship that has prompted the law to apply intense scrutiny to separation agreements between married couples. In contrast, the circumstances of unmarried parties who are negotiating prenuptial agreements are virtually the converse of a marital relationship. Typically, a monied prospective spouse, like Mr. Gottlieb here, will refuse to proceed with the marriage unless the non-monied prospective spouse accedes to the proposed terms; that is, the parties will never marry, and therefore never undertake the fiduciary obligations that status entails, unless and until the proposed agreement is signed.

The distinction between how the law treats the two situations is illustrated by the very fact that despite the inherent duress of a threat not to marry unless the proposed agreement is accepted, such a threat does not invalidate a prenuptial agreement (*see Barocas v Barocas*, 94 AD3d 551 [1st Dept 2012], *appeal dismissed* 19 NY3d 993 [2012]; *Cohen v Cohen*, 93 AD3d 506 [1st Dept 2012]).

The differentiation between married spouses and non-married couples for purposes of imposing a fiduciary duty is consistent with the law's general approach to marriage. As the U.S. Supreme Court recognized in *Obergefell v Hodges* (576 US —, 135 S Ct 2584 [2015]), marriage fundamentally alters the legal status of the couple, creating new legal rights and obligations that are not present for a non-married couple. Among those rights and obligations is the obligation to give, and the right to receive, the utmost good faith, fairness and loyalty that is the essence of a fiduciary duty.

My colleagues' view that established law imposes the same fiduciary duty owed in marital relationships on engaged couples entering into prenuptial agreements is not well-founded. I would not rely on *Matter of Greiff* (92 NY2d 341 [1998]) as does the majority writer, because it is an explicitly narrow ruling; it does not support a broad extension to prenuptial agreements generally of the rule imposing a fiduciary duty on separation agreements between spouses. Unlike *Greiff*, there is nothing extraordinary about Ms. Lumiere

Gottlieb's challenge to the prenuptial agreement at issue here. And, while there are circumstances in which a non-married romantic relationship may correspond closely enough to a married relationship to make imposition of a fiduciary duty appropriate (*see e.g. Rosenzweig v Givens*, 13 NY3d 774, 775 [2009]; *Robinson v Day*, 103 AD3d 584, 585 [1st Dept 2013]), in my view the relationship between these parties at the time they entered into the prenuptial agreement does not present such a situation.

A rule that a fiduciary duty arises by virtue of a couple's engagement would clearly be unworkable; the mere label and plan to become married in the future, is not enough in itself to create a duty of loyalty. And, barring such a bright-line rule, it would be difficult to pinpoint the moment in time, or particular circumstances that would cause a fiduciary duty to spring into being between fiancés. While some might suggest that having children together should be viewed as a viable basis for imposing a fiduciary duty, it is important to note that the law limits the obligations of unmarried parents to the support and care of the children, and does not impose a duty of support and care toward the partner. By the same token, the law should not be extended to impose a fiduciary duty solely by virtue of a couple's having children together.

A fiduciary relationship "may arise where a bond of trust and confidence exists between the parties and, hence, the defendant must be charged with an obligation not to abuse the trust and confidence placed in him or her by the plaintiff" (*Rocchio v Biondi*, 40 AD3d 615, 616 [2d Dept 2007]). The essence of a fiduciary relationship is the expectation that the fiduciary will, and should, be guided by the interests of the other party. No such expectation could have reasonably arisen here.

From nearly the outset of their relationship, Mr. Gottlieb indicated to his fiancée that he was not prepared to be generous with her in any way with respect to the emoluments of marital distribution—that marriage to him required her to accept a hard bargain, given his considerable wealth. But he laid these cards on the table, and, in fact, when the prenuptial agreement was finally negotiated and ready for execution, Ms. Lumiere's counsel urged her not to sign it—advice she refused to take. Ms. Lumiere could have had no expectation that Mr. Gottlieb was protecting her interests as his fiancée; his treat-

ment of her demonstrated the converse, the complete absence of a relationship of trust and confidence.*

The dissent suggests that the Court should provide legal protection to a party who from the beginning of her relationship with her future spouse refused to acknowledge what was always there to be seen—that her fiancé was never going to meet the most basic tenet of a fiduciary relationship. Marriage was a business to him, and he let her know that, not in so many words, but by his conduct. The dissent disagrees, asserting that Mr. Gottlieb did not make any such statements in his submissions to the Court, and in fact took the position that the agreement provides Ms. Lumiere Gottlieb with a "luxurious and secure life." However, the record strongly supports the inferences I draw with regard to how Mr. Gottlieb treated his fiancée at the time they entered into the agreement; assertions made by a party in court papers do not disprove those inferences.

Therefore, in a case such as this, when considering property distribution provisions of prenuptial agreements, we must look to the common-law standards for setting aside any type of contract, such as fraud, duress and unconscionability. Under this general common-law rule,

> "[p]eople should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability" (8 Richard A. Lord, Williston on Contracts § 18:1 at 8 [4th ed 2010] [internal quotation marks omitted]).

---

* It is not merely Mr. Gottlieb's negotiating style that negates the existence of a fiduciary relationship between the parties at the time they entered into the agreement. Rather, it is the entire constellation of events in the premarital life of this couple, as reflected in the record, that overwhelmingly demonstrates that Ms. Lumiere Gottlieb could not reasonably have reposed trust in Mr. Gottlieb when she executed the agreement.

"[A]n unconscionable contract has been defined as one which is so grossly unreasonable as to be unenforcible because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" (*King v Fox*, 7 NY3d 181, 191 [2006]). "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" (*Gillman v Chase Manhattan Bank*, 73 NY2d 1, 10 [1988] [internal quotation marks omitted]). The term "unreasonably favorable" is sometimes referred to as "substantive" unconscionability, while the "absence of meaningful choice" is referred to as "procedural" unconscionability (*see* 1 Farnsworth on Contracts § 4.28 at 583 [3d ed 2004]). Generally, both are necessary for unconscionability to be established as grounds to set aside a contract (*Gillman* at 10).

Procedural unconscionability is essentially equivalent to the term "overreaching." Both concepts focus on the process of arriving at the agreement. The definitions of "overreaching" offered by my colleagues here include "the concealment of facts, misrepresentation or some other form of deception" (*Stawski v Stawski*, 43 AD3d 776, 777 [1st Dept 2007]) and "cunning, cheating, [and] sharp practice" (*see Matter of Baruch*, 205 Misc 1122, 1124 [Sur Ct, Suffolk County 1954], *affd* 286 App Div 869 [2d Dept 1955]).

Of course, here, Ms. Lumiere Gottlieb explicitly conceded when moving for summary judgment that she was not claiming fraud, duress, or unconscionability. Therefore, her challenge to the property division provisions of the prenuptial agreement must be rejected without further discussion.

In any event, like the majority, I reject any suggestion of overreaching or procedural unconscionability here, because as this Court observed in *Barocas v Barocas* (94 AD3d at 552), "meaningful choice is not an issue inasmuch as defendant knowingly entered into the agreement against the advice of . . . counsel." In concluding otherwise, the dissent employs terms such as "shrewd manipulations" (citing *Ducas v Guggenheimer*, 90 Misc 191, 199 [Sup Ct, NY County 1915], *affd sub nom. Ducas v Ducas*, 173 App Div 884 [1st Dept 1916]) and exploitation of trust. However, there was no trickery or subterfuge involved here; Mr. Gottlieb's negotiating strategy

was entirely clear and apparent. Ms. Lumiere Gottlieb knew what she was getting into, and was advised not to, but ultimately decided to accept the offered terms because she wanted to get married. Willingness to enter into an agreement known to be one-sided, against the advice of counsel, because of the desire to get married, cannot establish the type of "absence of meaningful choice" that constitutes overreaching or procedural unconscionability (*see Strong v Dubin*, 48 AD3d 232, 232-233 [1st Dept 2008]).

In the absence of a showing of procedural unconscionability or overreaching in the formation of the prenuptial agreement, even under the *Christian* standard there is no basis to go on to examine the agreement for "manifest unfairness," as the dissent does at length.

Even if further examination were appropriate, that examination should concern whether the terms of the agreement were substantively unconscionable. This would entail considering whether the financial terms were so extreme and one-sided as to appear unconscionable (*see Gillman*, 73 NY2d at 12; 1 Corbin on Contracts § 128 [1950]). While a one-sided agreement leaving the parties with substantial disparities of wealth may strike some observers as unfair, that does not make it substantively unconscionable, since the facts were disclosed at the time the parties entered into the agreement (*see Smith v Walsh-Smith*, 66 AD3d 534, 535 [1st Dept 2009], *lv denied* 14 NY3d 704 [2010]), and particularly since Ms. Lumiere Gottlieb is not being left destitute.

It is possible that the use in *Christian* of the concepts of "overreaching" and "manifest unfairness" may simply have been new terminology essentially recapitulating the concepts of procedural and substantive unconscionability. However, the dissent's discussion expands substantially beyond considerations of substantive unconscionability, emphasizing the word "fairness" in the term "manifest unfairness" to suggest that the enforceability of a prenuptial agreement may be addressed by reference to the concept of adequacy, and by consideration of the marital standard of living.

This turns the law on its head. Indeed, if most prenuptial agreements were to be examined by the standards proposed by the dissent, most if not all of them would be found manifestly unfair. In general, the purpose of such agreements is not to achieve fairness, but to protect the assets of the monied party from being turned over to the other, and to strictly limit what

the non-monied spouse will receive in the event of a divorce. In particular, such agreements are geared toward avoiding any claim of entitlement to a distributive award or spousal support in proportion to the parties' standard of living during the marriage. The law imposes minimum requirements for certain types of financial provisions, but even accepting the applicability of the *Christian* standard, and even assuming there were a question of fact as to whether there was overreaching here, the question would not be whether the amounts being received by the non-monied spouse under the agreement approximates the parties' standard of living during the marriage. The "manifest unfairness" standard is not met by a failure to provide for an approximation of the marital standard of living after a divorce. If it did (assuming *Christian*'s applicability), the very purpose of prenuptial agreements would be eviscerated. There would be no reason to opt out of the Equitable Distribution Law if the very same considerations used to enforce the statute were applied in the event the parties opted out of the statute.

There is no dispute that the maintenance provisions of the parties' agreement must be judged by the standard expressed in Domestic Relations Law § 236 (B) (3), which only allows enforcement of maintenance provisions "provided that such terms were fair and reasonable at the time of the making of the agreement and are not unconscionable at the time of entry of final judgment." I agree with the majority that as a matter of law Ms. Lumiere Gottlieb failed to satisfy that standard. Ms. Lumiere Gottlieb's waiver of spousal support was not unfair or unreasonable at the time she signed the agreement. She has a degree in economics, and has been employed in finance; while her absence from the field while the children were young may impact her job search, she certainly has the ability to ultimately be self-supporting. Nor is that waiver unconscionable inasmuch as she will receive approximately $1.5 million, as well as an all-expenses-paid apartment up until the couple's children reach the age of 18.

In conclusion, I believe that coursing through the dissent is a not-so-veiled hostility to prenuptial agreements. All prenuptial agreements are in essence one-sided, and may seem unfair to those who believe fairness must be the guiding principal in financial distribution resulting from divorce. But the law gives parties the right to opt out of the Equitable Distribution Law and to order their own affairs. While the law still provides certain minimum standards to protect non-monied parties who

sign off on opting out in order to make their own arrangements, none of those protections offer economic recompense measured by the marital standard of living; imposing such a standard would eviscerate the right to opt out. One wonders, after reading our dissenting colleague's opus, whether prenuptial agreements should now be relegated to the dustbin.

FEINMAN, J. (dissenting). Resolution of this appeal and cross appeal requires us first to determine whether it is appropriate to decide this dispute on summary judgment, and second to clarify the difference between the defenses of "unconscionability" and "manifest unfairness." In this proceeding, each party to this marriage moved for partial summary judgment: plaintiff argued that the prenuptial agreement in question should be enforced as written; defendant argued that the agreement should be declared unenforceable because, among other reasons, it was the product of overreaching and is "manifestly unfair."

In the order appealed from, the motion court dismissed defendant's first and third counterclaims, which challenged the agreement as a whole and the property distribution provisions in particular, because it found "no dispute over material facts." However, the motion court ordered a trial on the second counterclaim, which challenged the maintenance waiver, on the ground that "not enough facts [had been] presented" to grant either party summary judgment. All three counterclaims, however, turn on the same set of facts, and in order to resolve these three counterclaims in a coherent manner, this Court must first determine whether any material issues of fact are in dispute.

I agree with the majority that all three counterclaims need to be decided on the same facts, but I disagree with its assessment that there are no triable issues at all. While it is certainly possible to cast defendant as impetuous and the negotiations as sober and deliberate, as the majority does, there is a sufficiently compelling alternative reading of the record to warrant a trial on the circumstances surrounding the formation of the prenuptial agreement and whether its enforcement is permissible. By summarily deciding this dispute based on the extant record, there is no real opportunity to evaluate whether any overreaching occurred during the negotiations. The negotiations contained several instances of highly questionable conduct on the part of plaintiff, and given the duty to negotiate marital agreements with the "utmost of good faith" (*Christian*

*v Christian*, 42 NY2d 63, 72 [1977]), we should not be so quick to excuse such conduct as simply "callous." In addition to plaintiff's conduct during the negotiations, the agreement also contains many troubling terms. On the surface, the agreement provides defendant with a handsome settlement estimated at $1.6 million, plus other benefits. However, the amount of the settlement is only part of the story, and a review of the agreement reveals numerous difficulties that could well support a finding of overreaching and manifest unfairness.

As a threshold matter, we must first resolve whether any overreaching has occurred in the execution of this agreement, and if so, whether the agreement is manifestly unfair as a result. The record does not offer a plain and clear answer to this question, or to whether the maintenance waiver is enforceable, and this case should not be disposed of summarily. Accordingly, I would deny summary judgment and remand the matter for trial so that the court may evaluate the credibility of the parties and decide all three counterclaims consistently and coherently on a more fully developed record.

### The Parties

Plaintiff, now 44, is the founder, chief investment officer, and majority shareholder of a biotechnology hedge fund, Visium Asset Management, with an estimated $3.8 billion of funds under management. He graduated from Brown University with a B.A. in economics and earned a medical degree from New York University. After completing an internship in internal medicine, he pursued a career in finance and worked at three investment firms before founding his hedge fund in 2005. At the time he filed for divorce in 2011, plaintiff earned $54 million in income, and he reported a net worth of $188 million in 2013.

Defendant, now 37, is the full-time caregiver of the parties' two young children, one of whom has special needs. She has been out of the workforce since 2007. She received a B.A. in economics from the University of Pennsylvania and worked at an Internet marketing company for one year and then as an analyst at a financial services firm for two years. She later obtained a real estate license, earning commissions on a handful of transactions, and then pursued a teaching certificate in yoga. Defendant is generally in good health but has an autoimmune disorder and suffers from anxiety, depression, and attention deficit disorder. In 2013, defendant earned no income and reported a net worth of $1.5 million.

## Background

In September 2003, the parties were introduced at defendant's 25th birthday party and started dating in December of that year. They soon began living together, and after a brief hiatus, they resumed their relationship in November 2004 with the intention of marrying. As discussions of marriage ensued, plaintiff indicated he would not marry without a prenuptial agreement. Defendant did not object, and the parties began discussing the parameters of an agreement based on preliminary terms proposed by plaintiff. The parties later became engaged in September 2005, but did so without an agreement.

One month after the engagement, defendant learned she was pregnant with the parties' first child and told plaintiff she did not want to have children until the parties were married. In response, plaintiff assured defendant that it would not be necessary to terminate the pregnancy because "there was no question" the parties were going to marry, and sign an agreement, by the time the baby was born.

However, after learning that defendant was pregnant, plaintiff modified his proposal and made defendant a new, and lower, offer. After some discussion, defendant accepted. But this reduction by plaintiff was only the first of many more reductions to come, and each time defendant accepted a new lower offer, plaintiff would lower his offer again and ask defendant to agree to his latest terms. As this pattern repeated itself and the baby's delivery date neared, defendant suggested that the parties separately retain counsel and arranged for the parties to jointly see a licensed clinical social worker. The counseling, however, did not help and the negotiations continued to stall following delays caused by plaintiff and his attorney. Then, when defendant was in the third trimester of the pregnancy, plaintiff unexpectedly announced he would not sign any agreement until after the baby was born, despite his earlier promise to defendant. As a result, the parties did not marry in time, and their first child was born in May 2006.

Several months after the birth of the first child, defendant asked plaintiff to revisit the agreement so that the parties could finally marry. Their discussions resumed, and plaintiff continued to reduce his obligations under the agreement, presenting lower and lower offers to defendant, each less favorable than the last. As the months passed, defendant learned she was pregnant with a second child, despite her use of birth control. Once again, defendant told plaintiff she did not want

any more children until the parties married. This time, plaintiff strongly opposed the suggestion of an abortion and threatened to end their relationship. Plaintiff then presented defendant with yet another offer—his 12th—with even less favorable terms. Throughout these discussions, defendant never made a full financial disclosure or produced financial statements indicating his income. As the second pregnancy progressed and the negotiations wore on, defendant instructed her attorney to finalize an agreement in order to end "the nightmare," in spite of her attorney's advice. Within three weeks of learning that defendant was pregnant with a second child, the parties finally executed an agreement and were married a week later at the Office of the City Clerk in May 2007.

## The Agreement

The terms of the agreement are described in detail by the majority, and on the surface, the provisions hardly seem unfair or problematic. For example, defendant receives, in the event of divorce, a distributive award of $300,000 for every year of marriage, $150,000 in "spousal support" for every year a child of the parties is under the age of four at the time of divorce, the use of an apartment for as long as a minor child of the parties lives with defendant, and health insurance until the children of the parties are emancipated. However, beneath the surface are many questionable provisions which should be examined at trial.

First, the agreement contains a number of sweeping waivers. Under the agreement, defendant waived her right to spousal maintenance, equitable distribution, counsel fees, interim counsel fees, a distributive award, any pension and retirement benefits, and the right to contest the agreement. The extent of these waivers cannot be overstated. Moreover, the waivers do not even seem to comport with the reality of the party's relationship. Such waivers, especially the waiver to spousal maintenance, "essentially declare[ ] that [defendant did not need support in case of divorce and would not be] economically disadvantaged by the years of marriage" (Robert Leckey, Contextual Subjects: Family, State, and Relational Theory 118 [2008]). Here, the parties do not dispute that plaintiff was to be the sole source of family income while defendant raised the children full-time and managed the family's household affairs. In fact, plaintiff actively discouraged defendant from pursuing a career outside the home, going so far as to call her real estate

career "a joke" and mocking that he could earn far more in one day than she could in one year. With defendant as the stay-at-home parent and full-time caregiver of the children, it simply cannot be taken at face value that defendant would not be in need of support in case of divorce and would not be economically disadvantaged by the years of marriage. These waivers are difficult to reconcile with the respective roles of the parties during their relationship, and in light of plaintiff's conduct during the negotiations, there are legitimate concerns that the waivers were procured by overreaching and are manifestly unfair.

Second, the agreement contains an expansive definition of separate property that applies to nearly all property acquired by the parties during their marriage, including income. Even assets that are commingled and pooled during the marriage are to be treated as separate property based on the amount deposited or invested by the party. Moreover, any contribution by a spouse that increases the value of the other's separate property is to be considered a "gift." The agreement also expressly designates the matrimonial home, which plaintiff purchased in his own name for $9.7 million, after the parties had married, as his separate property. While this expansive separate property provision suggests that the parties were self-supporting and would lead financially independent lives, this was never the case, and the agreement fully excludes defendant, the stay-at-home spouse, from sharing in any income earned by plaintiff during the marriage. It is therefore difficult to make sense of the fact that the agreement treats income, which only plaintiff earned, as separate property in light of the distinct family responsibilities assumed by the parties. As for the treatment of non-income property, such as the matrimonial home, the agreement similarly suggests that defendant would not contribute to increasing the value of plaintiff's assets. But here too, the conduct of the parties is entirely at odds with this provision's apparent intention. After plaintiff acquired two adjacent apartment units for $9.7 million, defendant spent more than one year overseeing the combination and renovation of the units. The newly combined units, which became the matrimonial home of the parties, now has an estimated value of $30 million. In spite of defendant's efforts, the agreement leaves her without any property interest in the matrimonial home, let alone to an increase in value equivalent to her contribution, all of which raises doubts as to whether the agree-

ment actually reflects the intentions of the parties at the time of execution.

Third, a significant, and troubling, condition attaches to the housing provision. As the majority notes, defendant is eligible for "rent-free, expense-free luxury housing." However, this entitlement is conditioned on any minor children of the parties residing with defendant. Otherwise, defendant loses the housing benefit and is given 30 days to vacate the apartment. As much as defendant may want the children to reside with her, this provision does not give her a choice in the matter, unless she is willing to give up the housing. This is no real choice, and it would come at a great cost to defendant if, at a later date, she ever wanted to change roles with plaintiff and have the children live with him. As a result of this requirement, defendant will also have less time to devote to her career than plaintiff will have to his. Ultimately, even though defendant benefits from the housing provision (for as long as the children live with her), it is the children of the marriage who are the primary beneficiaries, not defendant.

Fourth, and similar to the housing provision, the payment of what the agreement refers to as "spousal support" is conditional on there being children of the parties under the age of four at the time of divorce. The agreement does not provide any spousal support that is not contingent on the parties having children under a certain age. Since plaintiff filed for divorce eight months after the parties' youngest child turned four, defendant receives no "spousal support" under the agreement. This provision is far less generous than it appears, and in view of the other terms of the agreement and the manner in which it was negotiated, further scrutiny is warranted.

Finally, even when dealing with a distributive award amounting to $300,000 per year of marriage, context is everything. It is important to remember that the purpose of a distributive award is to facilitate the distribution or division of property between divorcing parties. It should not be seen or considered as a form of income or support (*see* Domestic Relations Law § 236 [B] [1] [b] ["Distributive awards shall not include payments which are treated as ordinary income to the recipient under the provisions of the United States Internal Revenue Code"]; *see also Holterman v Holterman*, 3 NY3d 1, 11 [2004]). Here, the distributive award was accorded in lieu of equitable distribution, which defendant was required to waive. As mentioned earlier, plaintiff reported a net worth of $188

million in 2013, and even if the distributive award totals $1.6 million after four years of marriage, it is a mere fraction of plaintiff's property. At this stage of the proceeding, we do not need to decide whether equity must intervene, but an imbalance of this magnitude must not be treated lightly, and a trial should determine whether there was any overreaching in the formation of this agreement that led to manifestly unfair terms.

In isolation, no one issue necessarily invalidates the agreement. Prenuptial agreements often include various waivers, custom definitions of separate and marital property, and arrangements tailored to the particular circumstances and needs of the parties. In this instance, however, because it is certainly possible to draw an inference of overreaching that resulted in manifestly unfair terms based on the totality of the circumstances, defendant's counterclaims should not be dismissed at this stage.

## Proceedings in the Motion Court

The proceedings in the motion court are summarized by the majority. It must be highlighted, however, that the parties presented starkly different versions of the negotiations in their motion papers.

On the one hand, plaintiff argued that the parties participated in a fair and thorough process which resulted in a generous agreement. He emphasized that the parties had negotiated for well over a year, were each assisted by experienced and independent counsel, had been advised of their rights, fully understood the agreement, executed it voluntarily, and acknowledged in the agreement that the terms were fair and reasonable.

Defendant, on the other hand, described the process as deeply flawed. She alleged that plaintiff substantially changed the bargaining position of the parties, that he put her in the unwanted, precarious position of negotiating as an unmarried mother, and that she relied on plaintiff's assurances in deciding to continue the first pregnancy. She also argued that plaintiff took advantage of her diminished emotional and physical state during both pregnancies, as she was not taking certain medications, and that the negotiations were tainted by plaintiff's "bait and switch" offers, numerous insults and threats, and failure to make a full financial disclosure.

As previously mentioned, the motion court dismissed defendant's first and third counterclaims, but not the second counter-

claim challenging the maintenance waiver. On this issue, the motion court decided it would "require evidence and testimony to determine whether the waiver of maintenance was fair and reasonable at the time of execution, when [defendant] was expecting the parties' second child, and/or is unconscionable now. Therefore, this issue can be addressed at trial." In addition, the court awarded defendant $50,000 in interim counsel fees to defend against plaintiff's motion for exclusive possession of the matrimonial home, and allowed defendant to affirmatively move for exclusive possession of the matrimonial home and for temporary child support.

## Arguments on Appeal

Plaintiff appeals to the extent the motion court granted a hearing on the maintenance waiver, awarded interim counsel fees, and denied his motion to dismiss defendant's second counterclaim, and primarily argues that there are no grounds to invalidate any part of the agreement given the waivers it contains.

Defendant cross-appeals to the extent the motion court dismissed her first and third counterclaims seeking to invalidate the prenuptial agreement. In particular, she argues the motion court misapprehended the equitable standard under which she seeks to invalidate the agreement, namely, manifest unfairness, and failed to shift the burden of proving the validity of the agreement onto plaintiff. Defendant also raises arguments related to a fourth counterclaim concerning the purchase price of the apartment in which defendant would reside with the children in case of divorce; however, because defendant disclaimed that her motion is based on fraud and expressly withdrew the fourth counterclaim below, I agree with the majority that these arguments are not properly before us.

## Analysis

The majority concludes that there are no substantial issues of fact and resolves this appeal on summary judgment. It finds that defendant has not shown that the agreement is manifestly unfair or that plaintiff engaged in overreaching during the negotiations, and that the maintenance waiver was "fair and reasonable at the time of the making of the agreement" and would "not [be] unconscionable at the time of entry of final judgment" (Domestic Relations Law § 236 [B] [3] [3]).

The extant record does not permit any such determination. As already discussed, there is significant controversy concern-

ing the formation of the agreement, and indeed, the motion court ordered a trial on this issue in connection with the second counterclaim. No factfinder has yet evaluated the credibility of either party's version of the facts surrounding the making of the agreement, and it may well be that a factfinder would find that there was overreaching in the formation of a manifestly unfair agreement or that the maintenance waiver is not enforceable.

As the majority resolves this appeal on summary judgment, its decision reaches the merits. Throughout its analysis, the majority asserts that "manifest unfairness" is distinct from the defense of unconscionability. I fully agree with those assertions, but the difference between these defenses is not readily discernable from the majority's application of "manifest unfairness" to this case. The distinction is relevant in this appeal because defendant expressly does not challenge the agreement on the basis of unconscionability, but rather contends that it is manifestly unfair to her as a result of plaintiff's overreaching. This issue has broad implications and deserves further discussion.

The meaning and significance of the manifest unfairness defense has been the subject of long-standing commentary among members of the bar. Manifest unfairness and unconscionability are terms that are sometimes used interchangeably (*see e.g. Luftig v Luftig*, 239 AD2d 225, 227 [1st Dept 1997] ["the agreement was not unconscionable . . . (Its) terms are not so manifestly unfair that equity must intervene to prevent an injustice"], citing *Christian v Christian*, 42 NY2d at 71), and the resulting ambiguity has left some wondering if manifest unfairness is simply "legal literature" that is "repeated in deference but without consequence" (1 Elliott Scheinberg, Contract Doctrine and Marital Agreements in New York § 24.2 [1] at 799 [2011]), and others observing that "it seems difficult to distinguish between an agreement that is 'unconscionable' and an agreement which is 'plainly inequitable' " (9 Alan D. Scheinkman, West's McKinney's Forms Matrimonial and Family Law § 4:8 at 41 [2007]), "inequity" being a term *Christian* employs alongside manifest unfairness (*see e.g. Christian* at 72 [in reference to agreements "subsisting in inequity"], *and id.* at 72, 73 [in reference to "inequitable conduct" of the parties]) that has also been applied in subsequent decisions of this and other courts (*see e.g. Cron v Cron*, 8 AD3d 186, 187 [1st Dept 2004], *lv dismissed* 7 NY3d 864 [2006],

*lv denied* 10 NY3d 703 [2008] ["the agreement's housing provisions . . . are plainly inequitable"]).

Arguably, it may be time to abandon the pretense that a distinction exists at all between unconscionability on the one hand and manifest unfairness (or "inequity") on the other. However, I would not favor moving in that direction as the distinction is not a matter of mere semantics. What is fundamentally at issue is whether there is a distinct standard of vacatur that uniquely applies to marital agreements (Scheinberg § 24.2), and rather than allow this equitable defense, which we refer to as "manifest unfairness," to be subsumed into the general defense of unconscionability, it is critical that the distinction be clarified and not permitted to vanish. Manifest unfairness serves an important and useful purpose in the matrimonial context, in which "[a]greements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith" (*Christian* at 72). It ensures that married and affianced parties participate in a fair process, and it provides relief when agreements are "manifestly unfair to a spouse because of the other's overreaching" (*id.*).

The difference between unconscionability and manifest unfairness was carefully examined by the Court of Appeals in *Christian,* an appeal which concerned a separation agreement between two parties whose marriage had broken down. At the time, parties in New York could not divorce under then section 170 (6) of the Domestic Relations Law without a valid separation agreement. Although both parties in *Christian* wanted to divorce and needed their separation agreement to be recognized as valid to do so, the plaintiff still challenged a portion of the agreement "which stipulated that there be an equal division of certain securities" (*Christian* at 66). Supreme Court declared that the agreement was invalid in its entirety, finding the defendant husband guilty of fraud and overreaching, and in the absence of a valid agreement, the court reasoned it could not grant a divorce and ordered the parties to resume their marital relationship. The Appellate Division reversed and granted a divorce, finding no evidence of fraud or overreaching in the record to invalidate the agreement, but declared that the impugned property provision was "so unconscionable as to be unenforceable" (*id.* at 71). Although the Court of Appeals expressed similar concerns, it reversed the determination of unconscionability by the Appellate Division and remanded the

matter to Supreme Court for a full trial on the property provision in accordance with the equitable standard established by the Court, namely, "manifest unfairness."

In its discussion, the Court noted that the term unconscionability does not actually appear in the case cited by the Appellate Division for that proposition (*id.*; *see also Riemer v Riemer*, 48 Misc 2d 873 [Sup Ct, Kings County 1965], *affd* 25 AD2d 956 [2d Dept 1966], *lv dismissed* 17 NY2d 915 [1966]). As a result, the Court defined unconscionability in these terms:

> "over the years, an unconscionable bargain has been regarded as one ' "such as no [person] in his [or her] senses and not under delusion would make on the one hand, and as no honest and fair [person] would accept on the other" ' (*Hume v United States*, 132 US 406, 411), the inequality being ' "so strong and manifest as to shock the conscience and confound the judgment of any [person] of common sense" ' (*Mandel v Liebman*, 303 NY 88, 94). Unconscionable conduct is something of which equity takes cognizance, when warranted (see *Weirfield Holding Corp. v Pless & Seeman*, 257 NY 536; *Graf v Hope Bldg. Corp.*, 254 NY 1, 4; *Howard v Howard*, 122 Vt 27; 27 Am Jur 2d, Equity, § 24, pp 549-550; cf. 2 Pomeroy's Equity Jurisprudence [4th ed], § 873, p 1804)" (*Christian* at 71).

It is worth noting that nearly all the cases cited by the Court in its review of unconscionability concern commercial transactions (*see e.g. Hume v United States*, 132 US 406 [1889] [reasonableness of government contractor costs]; *Mandel v Liebman*, 303 NY 88 [1951] [compensation agreements between agents and principals]; *Weirfield Holding Corp. v Pless & Seeman, Inc.*, 257 NY 536 [1931] [unconscionable conduct in mortgage foreclosure proceedings]; *see also Graf v Hope Bldg. Corp.*, 254 NY 1 [1930]; *Howard v Howard*, 122 Vt 27, 163 A2d 861 [1960] [Vermont action to rescind a settlement agreement in a filiation proceeding]).

The Court then turned to the marital context and discussed separation agreements. The Court observed that "[g]enerally, separation agreements which are regular on their face are binding on the parties," that "[j]udicial review is to be exercised circumspectly," and that where there has been full disclosure and "an absence of inequitable conduct . . . , courts should not intrude so as to redesign the bargain" (*Christian* at 71, 72).

The inquiry, however, does not end there, and the Court outlined a set of equitable principles that also apply in the course of reviewing transactions between spouses. As the Court acknowledged on more than one occasion, conjugal parties are not commercial actors: "Agreements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith" (*Christian* at 72, citing *Ducas v Guggenheimer*, 90 Misc 191 [Sup Ct, NY County 1915], *affd sub nom. Ducas v Ducas*, 173 App Div 884 [1st Dept 1916]). As a result, "[t]here is a strict surveillance of all transactions between married persons, especially separation agreements," and such agreements may be set aside under principles of equity (*Christian* at 72). It noted that "[e]quity is so zealous in this respect that a separation agreement may be set aside on grounds that would be insufficient to vitiate an ordinary contract" (*Christian* at 72). The Court summarized these principles in these terms:

> "[t]hese principles in mind, courts have thrown their cloak of protection about separation agreements and made it their business, when confronted, to see to it that they are arrived at fairly and equitably, in a manner so as to be free from the taint of fraud and duress, and to set aside or refuse to enforce those born of and subsisting in inequity" (*Christian* at 72).

Having considered the equitable principles relevant to the marital context, the Court then established manifest unfairness as a defense to the enforcement of separation agreements:

> "To warrant equity's intervention, no actual fraud need be shown, for relief will be granted if the settlement is manifestly unfair to a spouse because of the other's overreaching. In determining whether a separation agreement is invalid, courts may look at the terms of the agreement to see if there is an inference, or even a negative inference, of over-reaching in its execution. If the execution of the agreement, however, be fair, no further inquiry will be made" (*Christian* at 72-73 [citations omitted]).

In contrast to unconscionability, manifest unfairness is rooted in a long line of matrimonial cases which are cited by the Court (*Hendricks v Isaacs*, 117 NY 411 [1889] [equity may intervene in transactions between married parties]; *Benesch v Benesch*, 106 Misc 395, 402 [NY Mun Ct 1918] ["there is a

distinction to be drawn between contracts of separation between husband and wife and strictly business contracts. The same strict principles or the same considerations that are applied to or govern the duties of parties to business contracts cannot always govern or be applied to the enforcement of every provision of a separation agreement"]; *Hungerford v Hungerford*, 161 NY 550, 553 [1900] [contracts between spouses must be "just and fair" and equity intervenes as required]; *Cain v Cain*, 188 App Div 780 [4th Dept 1919] [spousal support agreement may be set aside upon grounds otherwise insufficient to set aside an ordinary contract]; *Scheinberg v Scheinberg*, 249 NY 277, 282 [1928] [settlement agreement between divorcing spouses unenforceable at equity if one party "acts unfairly and the other yields to the pressure of circumstances"]; *Matter of Smith*, 243 App Div 348, 353 [4th Dept 1935] [agreements between divorcing spouses must be "fair and equitable"]; *Ducas v Guggenheimer*, 90 Misc at 194 ["(courts) have thrown around separation agreements the cloak of their protection to the end that they shall be free from the taint of fraud or duress and that they shall be fair, equitable and adequate, considering the husband's circumstances"]; *Montgomery v Montgomery*, 170 NYS 867, 869 [Sup Ct, NY County 1918] ["contracts between husband and wife are only upheld (in equity) where they are fair and equitable"], *affd* 187 App Div 882 [1st Dept 1919], *affd* 188 App Div 965 [1st Dept 1919]).

It is clear that *Christian* intended to distinguish manifest unfairness and to establish a standard that is appropriate for reviewing marital agreements. Indeed, many decisions of this Court follow *Christian* in this regard (*see e.g. Goldman v Goldman*, 118 AD2d 498, 500 [1st Dept 1986] ["In *Christian* . . . , the Court of Appeals held that separation and property settlement agreements are reviewable in equity and may be set aside if 'manifestly unfair to a spouse because of the other's overreaching' "]; *see also Cron v Cron*, 8 AD3d at 187 [finding that while a prenuptial agreement was not unconscionable, other provisions were invalid as "plainly inequitable"]). Nevertheless, other decisions simply rely on *Christian* for the principle of unconscionability and do not apply the manifest unfairness standard or the equitable principles established therein (*see e.g. Rowley v Amrhein*, 46 AD3d 489, 489 [1st Dept 2007] ["Plaintiff contends that even if the agreement is valid, it is unconscionable. However, nothing in the agreement shocks the conscience"], citing *Christian* at 71; *Kojovic v Goldman*, 35

AD3d 65, 69 [1st Dept 2006], *lv denied* 8 NY3d 804 [2007] ["the concept of unconscionability is reserved for the type of agreement so one-sided that it 'shock(s) the conscience' such that 'no (person) in his (or her) senses and not under delusion would make (it) on the one hand, and . . . no honest and fair (person) would accept (it) on the other' " (internal quotation marks omitted)], quoting *Christian* at 71; *Smith v Walsh-Smith*, 66 AD3d 534, 534 [1st Dept 2009], *lv denied* 14 NY3d 704 [2010] ["We reject defendant's contention that the prenuptial agreement is unconscionable . . . (W)e cannot say that the agreement is so unfair 'as to shock the conscience and confound the judgment of any (person) of common sense' "], quoting *Christian* at 71; *Leighton v Leighton*, 46 AD3d 264, 267 [1st Dept 2007, Nardelli, J., concurring in part, dissenting in part], *appeal dismissed* 10 NY3d 739 [2008] ["the 1986 prenuptial agreement is manifestly not unconscionable, for it cannot be said that it was so unfair as to shock the conscience"], citing *Lounsbury v Lounsbury*, 300 AD2d 812, 814 [3d Dept 2002]). In some ways, *Christian* is the buffet option of matrimonial cases. There is something for everyone—many cases cite *Christian* for the principle of judicial restraint; many others invoke it for the principle of judicial review (*compare Golding v Golding*, 176 AD2d 20, 22 [1st Dept 1992], *with Kojovic v Goldman*, 35 AD3d at 71). However, *Christian* should not be reduced to mean all things to all people, and this appeal highlights the need to review and revisit the meaning and application of "manifest unfairness."

"Manifest unfairness" involves a two-pronged inquiry into the execution and substance of the agreement. First, the contestant must show that the other party overreached in the execution of the agreement. *Christian* did not define overreaching but referred to two cases. The first, *Matter of Baruch* (205 Misc 1122, 1124 [Sur Ct, Suffolk County 1954], *affd* 286 App Div 869 [2d Dept 1955]), a dispute over a prenuptial agreement, defined overreaching in these terms: "we come to the charge of overreaching, which means to overdo matters, or get the better of one in a transaction by cunning, cheating, or sharp practice." The other, *Pegram v Pegram* (310 Ky 86, 90, 219 SW2d 772, 774 [1949]), noted that "the court will not suffer the wife to be over-reached. It will not sustain a contract that is unfair or prejudicial to her when obtained while she is under her husband's domination." *Christian* also asserted that overreaching does not require a showing of fraud, and that courts

may look at the terms of the agreement to draw an inference or a negative inference of overreaching in the execution.

This first prong is essentially a procedural inquiry and encompasses the entire duration of the negotiations; it is not limited to the period immediately preceding the conclusion of the agreement. Overreaching may be viewed in terms of bargaining abuses, such as "shrewd manipulations" (*Ducas*, 90 Misc at 199), as well as threats, intimidation, unfair surprises, exploitation of trust, and deceit (*see* Robert S. Adler & Elliot M. Silverstein, *When David Meets Goliath: Dealing with Power Differentials in Negotiations*, 5 Harv Negot L Rev 1, 29 [2000]). Moreover, overreaching may include tactics which, though permissible in the commercial arena, do not belong in negotiations between parties who owe fiduciary duties to each other (*see e.g. Ducas,* 90 Misc at 196 ["The courts should require the contract to be the free act of the parties rather than the product of shrewd bargaining by astute intermediaries, however free these bargainings may be from the taint of fraud or duress"], cited by *Christian* at 72). Compared to unconscionability, manifest unfairness subjects the negotiating process between conjugal parties to a higher degree of scrutiny and does not sanction unscrupulous methods.

If the first step shows an absence of overreaching, the inquiry ends and enforcement cannot be avoided under this defense. However, if the contestant establishes overreaching, the inquiry proceeds to the second step in which the contestant must then show that the agreement is manifestly unfair.

What, then, is manifestly unfair in the context of marital agreements? On this point, *Christian* does not provide all the answers. As a general principle, the fairness of an agreement ought to correspond to the intention of the parties as expressed in an agreement. The function of contract is to "structure a relationship and channel parties' expectations forward in time" (Leckey at 117), and ordinarily, the intention of the parties is found in the four corners of an agreement (*Laurence v Rosen*, 228 AD2d 373, 374 [1st Dept 1996]; *see also Van Kipnis v Van Kipnis*, 11 NY3d 573, 577 [2008] ["As with all contracts, prenuptial agreements are construed in accord with the parties' intent, which is generally gleaned from what is expressed in their writing"]). However, where there has been overreaching, an agreement may not reliably reflect the intentions of the parties, making it more difficult to evaluate whether the parties considered their agreement to be fair.

In the absence of a reliable writing to indicate the intention of the parties, the common law has developed alternatives for determining the fairness of an agreement. In the cases cited by *Christian*, one method of measuring the fairness of an agreement is the "test of adequacy." For instance, in *Ducas*,

> "[t]he test of adequacy is not what constitutes the minimum upon which a person can live. The question is whether the sum is in itself a reasonable one and will permit of a standard of living commensurate with the husband's income and the mode adopted by him when the parties lived together" (90 Misc at 200).

Under this approach, fairness is measured against the marital standard of living and is based on the financial means of the overreaching party. Another approach, followed by the Second Department, determines fairness according to the nature and magnitude of any rights waived in light of the disparity in net worth and earnings of the parties (*Petracca v Petracca*, 101 AD3d 695, 698 [2d Dept 2012]). These methods of determining the fairness of a prenuptial agreement can be helpful; however, a better approach would be one that also considers how well the terms of an agreement align with the conduct of the parties over the course of their relationship as a means of determining what the parties themselves consider to be fair. Terms that may appear to be objectively unfair may nevertheless be considered fair to the parties of an agreement, especially by parties who do not wish to have an economically interdependent relationship. For example, a prenuptial agreement that waives maintenance, narrowly defines marital property, and discourages the commingling of assets would suggest that the parties do not intend to have a relationship of economic interdependence, and if the conduct of the parties is generally consistent with the terms of an agreement, this would support that an agreement is fair to them. But where the expressed terms of an agreement are so divorced from the reality of a party's relationship, such as where there is a severe disconnect between the degree of economic interdependence expressed by the terms of an agreement compared to the conduct of the parties, as may be the case here, it is appropriate for equity to intervene to the extent a party's overreaching has caused the inconsistency. Indeed, in *Van Kipnis*, the Court of Appeals similarly considered whether the terms of a prenuptial agreement were consistent with the conduct of the parties during their marriage and upheld the prenuptial agreement because

they were consistent.[1] Contrary to what the concurrence asserts, I am not suggesting that the marital standard of living or the concept of adequacy be the *sole* criteria for evaluating the fairness of marital agreements.

This review of *Christian* highlights the distinction between manifest unfairness and unconscionability and seeks to clarify certain ambiguities. However, while agreeing that manifest unfairness is the appropriate standard, the majority, by adopting a much more deferential approach, seems to apply an unconscionability standard instead, which in my view is not correct. But notwithstanding this disagreement, there is no dispute between the majority and the dissent concerning the applicability of *Christian*'s manifest unfairness standard to prenuptial agreements.

My concurring colleague, on the other hand, comes to the novel conclusion, on the basis of *"expressio unius est exclusio alterius,"* and a series of doubtful inferences, that the Equitable Distribution Law essentially superseded the manifest unfairness standard in *Christian* by "explicitly and implicitly provid[ing] standards by which to determine the enforceability of the various components of prenuptial agreements." There is simply no support for this premise. The interplay between the standards contained in *Christian* and the Equitable Distribution Law has already been considered by this Court in the past, and in cases where the statutory standard did not apply, the *Christian* standard of manifest unfairness has been applied instead (*see e.g. Goldman v Goldman*, 118 AD2d at 500 ["Although the statutory standard in Domestic Relations Law § 236 (B) (3) is inapplicable here, traditional common-law standards do apply to test the validity and enforceability of the agreement. In *Christian* . . . , the Court of Appeals held that separation and property settlement agreements are reviewable in equity and may be set aside if 'manifestly unfair to a spouse because of the other's overreaching' . . . In our view, it is appropriate to take into account these common-law equitable factors, notwithstanding the inapplicability here of the broader 'fair and reasonable (when made) and . . . not unconscionable

---

1. "[W]ith the exception of two jointly owned residences (which were distributed as marital property), the parties did not commingle their separately owned assets throughout their 38-year marriage. We therefore agree with the courts below that the agreement constitutes an unambiguous prenuptial contract that precludes equitable distribution of the parties' separate property, rendering it unnecessary to resort to extrinsic evidence" (*Van Kipnis* at 579).

at final judgment' statutory standard" (citations omitted)], citing *Christian*). The concurrence contends that the reliance on *Goldman* is misplaced because it was an action to set aside a "reconciliation agreement" to which Domestic Relations Law § 236 (B) (3) allegedly does not apply. However, this is incorrect. In *Goldman*, it was not the type of *agreement* that made the Domestic Relations Law inapplicable. Rather, it was the type of *action* that precluded the application of the statute, and since the action brought in *Goldman* was not a "matrimonial action" as defined by the statute, it was not subject to Domestic Relations Law § 236 (B) (3).[2] Either way, it is well settled that to the extent the Domestic Relations Law does not apply to particular provisions of a marital agreement, the traditional common-law standard established in *Christian* applies instead. Not only is the view of the concurrence not the law, but it also does not follow that the establishment of a statutory standard for certain provisions voids the common-law standard applicable to all other provisions. The Equitable Distribution Law has never been read as superseding *Christian*, and I see no reason to start reading it that way now.

The concurrence also claims that there is "scant support" for extending *Christian*, which concerned a separation agreement, to prenuptial agreements, and that the cases that apply *Christian* "most often" involve separation agreements. There is simply no support for this generalization. Basic research on any legal database clearly shows that for nearly 40 years, *Christian* has been consistently applied to prenuptial agreements and separation agreements alike by courts at every level, including the Court of Appeals. Indeed, the Court of Appeals has just recently cited *Christian* in a probate action in which a petitioner contested a prenuptial agreement (*see Matter of Fizzinoglia*, 26 NY3d 1031 [2015]). Nevertheless, the concurrence still concludes that *Christian* does not apply to prenuptial agreements or to affianced parties, notwithstanding the overwhelming case law to the contrary.

---

**2.** As this Court decided in *Goldman*,

"We agree with Special Term that the second cause of action as couched is legally insufficient. Domestic Relations Law § 236 (B) (3) expressly applies to the validity and enforceability of certain agreements 'in a matrimonial action', which is defined in Domestic Relations Law § 236 (B) (2). This is not a matrimonial action since plaintiff does not seek separation, divorce, annulment, a declaration of the validity or nullity of a marriage, maintenance or a distribution of marital property" (*Goldman* at 500).

I agree with the concurrence to the extent it asserts that "when considering property distribution provisions of prenuptial agreements, we must look to the common-law standards." However, I simply do not agree with the common-law standards my colleague applies or the authorities on which he relies. Even though courts at every level have applied the equitable principles established in *Christian* to premarital and separation agreements for nearly 40 years, the concurrence reaches the conclusion that "it is not appropriate to look to *Christian* for the current standard for judging the enforceability of prenuptial agreements[ ]" and that "the use of *Christian's* standards for judging property provisions is incorrect." Instead, the concurrence would apply the standards applicable for setting aside "any type of contract." To do so would be incompatible with *Christian* and 40 years of matrimonial law and would abandon the power of the court to do equity when required. And rather than apply matrimonial standards to matrimonial disputes, the concurrence applies commercial standards to matrimonial disputes. For example, my colleague relies extensively on classic contract law treatises such as Williston on Contracts, Farnsworth on Contracts, and Corbin on Contracts and virtually ignores the authorities in the field of matrimonial law. My colleague also relies extensively on commercial cases such as *Gillman v Chase Manhattan Bank* (73 NY2d 1, 10 [1988]) in support of the unconscionability standard he advances. However, *Gillman* involved a dispute between Chase Manhattan Bank, N.A. and the creditors of the Jamaica Tobacco and Sales Corp. over a security agreement. This case could not be more removed from the matrimonial context. Nevertheless, the concurrence quotes certain passages from *Gillman* in which the Court addresses the issue of unconscionability. What the concurrence fails to ever mention is that *Gillman* involved the application of the Uniform Commercial Code, and the passage quoted by the concurrence concerns section 2-302 of the Uniform Commercial Code, "Unconscionable Contract or Clause." Never before has the Uniform Commercial Code been applied to the matrimonial context. And while the concurrence strongly opposes applying *Christian*, and four decades of matrimonial case law, to this case because the former concerns a separation agreement and the latter a prenuptial agreement, it is seemingly undisturbed by importing the Uniform Commercial Code and applying *Gillman*, a commercial dispute over a security agreement, to a prenuptial agreement.

Indeed, there is little support for the views expressed by the concurrence among the departments of the Appellate Division. Most notably, *Cioffi-Petrakis*, a leading decision of the Second Department that my colleague does not cite, expressly held that "agreements addressing matrimonial issues have been subjected to limitations and scrutiny *beyond that afforded contracts in general*" (*Cioffi-Petrakis v Petrakis*, 103 AD3d 766, 767 [2d Dept 2013], *lv denied* 21 NY3d 860 [2013] [emphasis added and internal quotation marks omitted]). It describes the heightened scrutiny applicable to marital agreements in these terms: "an agreement between *spouses or prospective spouses* may be invalidated if the party challenging the agreement demonstrates that it was the product of fraud, duress, or other inequitable conduct" (*Cioffi-Petrakis* at 767 [emphasis added], citing *Christian* at 73).

At this stage of the proceedings, it is premature to make any findings of fact as to whether plaintiff engaged in overreaching, and similarly premature to find that there are no issues as to whether the spousal maintenance waiver is unconscionable as applied to present circumstances. Even in *Barocas*, a case cited several times by the majority which involves similar issues, the split majority there remanded the spousal support waiver for trial and did not decide that issue summarily (*Barocas v Barocas*, 94 AD3d 551, 552 [1st Dept 2012], *appeal dismissed* 19 NY3d 993 [2012] ["Although defendant's waiver of spousal support was not unfair or unreasonable at the time she signed the agreement, given her knowing and voluntary execution thereof with benefit of counsel, factual issues exist as to whether the waiver would be unconscionable as applied to the present circumstances"]). I agree with the majority that certain factors, such as the presence of independent counsel, militate against a finding of overreaching. Moreover, the majority correctly points out that "the mere fact that [plaintiff] did not include his income in his financial disclosure, standing alone, is not a basis to set the agreement aside" and that an agreement cannot be set aside "merely because" it may have been improvident or one-sided. However, far from standing alone, plaintiff's failure to make a full financial disclosure is just one of many indicia of either overreaching or manifest unfairness, including his conduct during the negotiations, the use of dilatory tactics, the many questionable provisions and lopsided distribution under the agreement, the conflicting versions of events surrounding the negotiations, and the inconsis-

tency between the conduct of the parties with the terms of the agreement. In short, there are sufficient indicia in the record to support defendant's defenses and counterclaims to preclude summary judgment.

I strongly disagree with the concurrence's assertion that the relationship between the parties here did not give rise to any mutual fiduciary duties. As the majority highlights, "the parties were engaged, had been living together for more than three years, had a child together, and were expecting another." However, my concurring colleague, who recognizes that "[a] fiduciary relationship 'may arise where a bond of trust and confidence exists between the parties,'" would hold that this particular relationship does not "correspond closely enough to a married relationship." If the relationship between these parties does not "correspond closely enough to a married relationship," I cannot imagine what would. Moreover, rather than conclude that plaintiff was in breach of his fiduciary duties to defendant, the concurrence takes the extraordinary and troubling position that defendant essentially should have known better than to trust plaintiff, that plaintiff's treatment of her demonstrated the absence of a relationship of trust and confidence, and that the harsh consequence of defendant's allegedly misguided judgment is to deny the recognition of any fiduciary relationship whatsoever. This reasoning puts the cart before the horse and is decidedly out of step with the jurisprudence on fiduciary relationships cited by the majority. It is a mistake of law to assert, as the concurrence seems to reason, that conduct in breach of a fiduciary duty proves the absence of a fiduciary relationship altogether. The obligations attendant to fiduciary duties arise out of the particular nature of the relationship of the parties and are imposed by law. The parties did not have an obligation to enter into a prenuptial agreement, but they did, as fiduciaries, have an obligation of loyalty to each other and an obligation to negotiate with the utmost good faith.

The concurrence also reaches the conclusion that the agreement is not substantively unconscionable because "the facts were disclosed at the time the parties entered into the agreement." However, defendant expressly argues that plaintiff did not make a full financial disclosure. Because there are triable issues concerning the adequacy of plaintiff's disclosure, the concurrence should not be drawing any resulting legal conclusions at this stage.

There is also no basis whatsoever in the record for the concurrence's assertion that "Mr. Gottlieb indicated to his fiancée that he was not prepared to be generous with her in any way with respect to the emoluments of marital distribution," that "marriage to [plaintiff] required [defendant] to accept a hard bargain," and that he "laid these cards on the table." These arguments were never raised by the parties nor do they even come close to their respective versions of events. On the contrary, plaintiff has contended all along in his submissions that the settlement generously provides for defendant. Plaintiff has never alleged that he "required [defendant] to accept a hard bargain." Also without support in the record is the concurrence's claim that "[m]arriage was a business to [plaintiff], and he let her know that" or the concurrence's unfounded inference that plaintiff somehow communicated this alleged sentiment "not in so many words, but by his conduct." Nowhere in the record is there any support for these claims or inferences. Although this version of events and colorful language may make for interesting reading, it views the record through a prism that examines the record only in the light most favorable to plaintiff.

The concurrence also claims to find a "not-so-veiled hostility to prenuptial agreements" coursing through this dissent. To be clear, I harbor no such sentiment. Rather, the question is simply whether, on the extant record, summary judgment should be denied so that the facts in dispute surrounding the making of the agreement may be determined at trial. I fully agree with my colleague that "the law gives parties the right to opt out of the Equitable Distribution Law," but opting out of the statutory scheme does not also entail opting out of the common law. If it is found that plaintiff did not overreach, that the terms are not manifestly unfair in spite of any overreaching, or that the maintenance waiver is permissible, then those terms should be declared enforceable. The concurrence, however, prefers to exaggerate my position and wonders "whether prenuptial agreements should now be relegated to the dustbin." Such hyperbole is unnecessary. The defense of manifest unfairness intervenes only where the execution of an agreement is tainted by overreaching, and in the absence of overreaching, courts do not inquire further.

Finally, the award for interim counsel fees should not be vacated, and a hearing should not be required to determine what portion of the $50,000 sought by defendant is connected

to child-related issues. Plaintiff primarily argues that the agreement bars any award of counsel fees and that defendant provided no documentation in support of her application. "The purpose of interim counsel fees is to level the playing field while litigation is ongoing" (*Saunders v Guberman*, 130 AD3d 510, 511 [1st Dept 2015] ["The courts are to see to it that the matrimonial scales of justice are not unbalanced by the weight of the wealthier litigant's wallet"], citing *O'Shea v O'Shea*, 93 NY2d 187, 190 [1999]), and it is clear that the playing field between these parties is far from level. Courts possess the discretion to award interim counsel fees, "as . . . justice requires," under Domestic Relations Law § 237 (a). The court determined that defendant "lacks sufficient funds of her own to compensate counsel without depleting her assets" and it was well within the discretion of the court to award interim counsel fees to defendant. In the absence of any finding that the motion court abused its discretion, the award should not be disturbed, especially since this award is interim and subject to adjustment in any final determination.

## Conclusion

For the reasons set forth above, I would modify the order of the Supreme Court, to the extent appealed from, by denying plaintiff's motion for summary judgment, reinstating defendant's first and third counterclaims, and remanding for trial on whether the prenuptial agreement should be declared unenforceable in whole or in part.

SWEENY, J.P., and ANDRIAS, J., concur with RICHTER, J.; SAXE, J., concurs in a separate opinion; FEINMAN, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered October 31, 2013, modified, on the law and the facts, to deny the cross motion to dismiss the first and third counterclaims, to declare that the parties' prenuptial agreement is valid and enforceable, that the agreement's maintenance provisions were fair as of the date of execution and are not currently unconscionable, and that the agreement's property distribution provisions were fair as of the date of execution, to deny the cross motion for interim counsel fees, to vacate the award of such fees, to remand the matter for proceedings consistent herewith, and otherwise affirmed, without costs.

Motion for stay denied as academic.